[Civ. No. 10689.  Second Appellate District, Division One.—March 24, 1937.]

WILLIAM H. ANDERSON, Appellant, v. C. O. HAGEN et al., Respondents.

[Civ. No. 10690.  Second Appellate District, Division One.—March 24, 1937.]

WILLIAM H. ANDERSON, Appellant, v. C. O. HAGEN, etc., Respondent.

[Civ. No. 10669.  Second Appellate District, Division One.—March 24, 1937.]

C. O. HAGEN et al., Respondents, v. O. J. WEBER CO., (a Corporation) et al., Appellants.

LeRoy M. Edwards and O. C. Sattinger for Appellants.

Ernest U. Schroeter, Clark J. Milliron, George H. P. Shaw and John H. Foley for Respondents.

BISHOP, J. *pro tem.*—Growing out of an acquaintance begun in the Philippine Islands, a confidential relationship approaching that most happily found between a father and a mature son existed between William H. Anderson and C. O. Hagen during the years 1923–1933. The former, believing in the ability of the latter as an executive, and with confidence in his integrity as a man of business, entrusted to him during those years sums totaling over one and a quarter million dollars. Among other wreckages which came out of the depression was this friendship, and these three suits were filed, tried together and presented to us on a common record.

The first suit filed in the trial court has been known throughout the history of this litigation as the "accounting case". Anderson, as plaintiff, claimed that he had advanced a total in excess of $849,000 to Hagen in trust under an agreement that it was to be invested for him. Improper investments and profits not reported were alleged as the basis of the accounting which was sought. It was also claimed that a part of the moneys advanced had been used by Hagen to buy stock for himself in the O. J. Weber Company, and a judgment impressing a trust on the stock, now standing in the name of Hagen and his wife, was sought. The judgment

entered, that plaintiff take nothing, reflected the trial court's conclusions that the advances to Hagen which, in part, enabled him to pay for his stock, were loans, not trust funds, and that he had already properly accounted for every cent of both the principal and profits of the sums entrusted to him. The evidence, as we view it, supports the trial court's findings, so that the judgment from which the plaintiff has appealed must be affirmed.

Another action was filed by Anderson against Hagen alone, the "rescission case", in which he sought judgment for $112,500, the amount paid to Hagen for one-sixth of the stock in the O. J. Weber Company. The trial court's findings that the representations were not false, and that, in part at least, they were not relied upon by the plaintiff, and that there was no rescission, are supported by the evidence. It follows that the plaintiff is not successful in his attack on the judgment in this case.

The third suit, the "conversion action", was brought by the Hagens, complaining that their five hundred shares of stock had been converted by Anderson and the O. J. Weber Company. A judgment against the two defendants for $100,000 we find it necessary to reverse because of an erroneous admission of hearsay evidence.

The problems in these cases which required solution at the hands of the trial judge were almost entirely questions of fact; the principles of law involved were comparatively simple and quite thoroughly established. With respect to questions of fact our duty on appeal is plain. It is neither our function nor our right to read the record to determine whether or not we agree with the conclusion reached by the trial court. If there is a conflict in the evidence, the decision of the trial court is conclusive on us, unless the conflict is fanciful only and the decision is one which a reasonable mind, functioning without prejudice, could not have reached. Our power begins and ends with the task of determining whether there is any substantial evidence, contradicted or not, which supports the trial court's finding. All legitimate and reasonable inferences which uphold the finding must be made. Also its judgment, not ours, on the credibility of witnesses controls. These several statements are too elementary to merit the citation of authority, but their restatement will serve to orient us as we touch upon the evidence.

*The Accounting Case, Civil No. 10689.*

The appellation "the accounting case", applied by the parties to the case first to be considered by us, proved to be a misnomer. Out of the sum of $1,374,243.09 which Hagen was shown to have handled for Anderson in the many matters and during the ten years in which he dealt with and for him, it ultimately developed in this "accounting" case that but one sum remained questioned by the plaintiff, that the sum of $6,800. Anderson's counsel, after he had digested their auditor's report, conceded that they did not question the correctness of Hagen's basic accounting made in 1930, at which time he gave four promissory notes and an I.O.U. since paid, by way of settlement. The sum of $6,800 was a dividend which Hagen testified that Anderson gave him as a present, a statement which Anderson categorically denied. The trial court resolved this conflict in the evidence in favor of Hagen, possibly believing him rather than Anderson because in reply to a letter written by Hagen in which reference was made to "that dividend that you donated to me", Anderson not only made no denial of the donation, but referred to the dividend in a manner consistent with the understanding that it had been given.

█ This leaves but one issue unsettled in this first case, and its identity is conceded by the parties: Were the moneys advanced by Anderson to Hagen all placed in his hands as a trustee, or were the early sums advanced as loans? The position taken by the plaintiff, set forth in his complaint, is that he placed large sums of money in Hagen's hands to be invested for him, but that, unknown to him, Hagen had used some of his (Anderson's) money to buy stock in Weber Company in his (Hagen's) name. By way of answer Hagen admitted receiving large sums to invest for Anderson, but, he alleged, he also received sums as loans, and he bought no stock with Anderson's money. The trial court found that money was advanced to invest (all of which was satisfactorily accounted for), but that there were also advances as loans, and that the stock which Hagen bought and which now stands in the name of himself and wife, was not bought with Anderson's money.

Because words are frequently susceptible of two meanings, care must be taken in their use. So it is that, while it may be said that a contractor who borrows money from a bank

to meet his payroll pays his men with the bank's money, it is obviously not the bank's money from a legal viewpoint. Also one who lends another a sum without security would scarcely do so if he did not trust the other, but it cannot be said in law that it is advanced to him in trust because it is entrusted to him. When the trial court found, therefore, that Hagen did not buy stock with Anderson's money, the finding is defensible even though the stock was purchased with money which, because of his trust in him, Anderson had loaned Hagen. (*Preston & McKinnon* v. *Brennan*, (1901) 135 Cal. 55 [66 Pac. 981].)

The position of the plaintiff, analyzed more closely, is that the stock the Hagens now have standing in their names they hold as involuntary trustees under section 2224 of the Civil Code, which provides: "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained for the benefit of the person who would otherwise have had it." Clearly, the section can only be said to be applicable if the Hagens acquired their stock through the violation of a trust; no other condition of the section finds any support in the evidence. What trust was violated? It can be no other than a trust under which Hagen acquired over ninety-nine thousand dollars. Upon no theory suggested by the plaintiff was Hagen an involuntary trustee of the ninety-nine thousand dollars. If he held it in trust at all, it was under a voluntary trust created, according to sections 2221 and 2222 of our Civil Code, by words or acts "indicating with reasonable certainty" an intention to create a trust on the one hand, an acceptance on the other. The problem before the trial court, therefore, was to determine whether by words or acts the parties had created a voluntary trust with respect to the ninety-nine thousand dollars placed by Anderson in Hagen's hands, or whether the money was loaned to Hagen.

"A voluntary trust," states section 2216 of the Civil Code, "is an obligation arising out of a personal confidence reposed in, and voluntarily accepted by, one for the benefit of another." "A loan of money," we find in section 1912 of the same code, "is a contract by which one delivers a sum of money to another, and the latter agrees to return at a future time a sum equivalent to that which he borrowed." The

trial court was warranted in concluding that the ninety-nine thousand dollars was advanced as a loan and was not placed in Hagen's hands in trust, by the evidence of what the parties understood their deal to be, and by the evidence of what that deal actually was.

Before his business transactions with Anderson began, Hagen had acquired some 175 shares in the O. J. Weber Company at a price of about $38,000. One McKnight owned a controlling interest in the company and he and Hagen entered into a contract whereby it was agreed that the Hagens should buy and McKnight sell until they each had an equal interest in the company. Of all of this and his ambitions to make a great go of the concern, Hagen told Anderson when they renewed the acquaintance begun in the Philippine Islands. Anderson, according to his own testimony, inquired if Hagen could use some funds. No sum was advanced as an immediate result of the first inquiry, but later a meeting between the two was held in New York, and Anderson began to advance Hagen money.

Unless the parties' own characterization of the nature of their relationship is competent evidence, a question that has not been raised and is not being decided, the plaintiff's position is almost if not entirely without support, for he depends for his trust theory on Hagen's use of the words ''as a trust fund'' on several occasions. When the first sum of $20,000 was forwarded to him, a sum not used to acquire stock, so of no immediate concern to us, he signed a receipt reciting that it was ''to be used in a trust fund for the benefit of Wm. H. Anderson''. In January of each of the years 1925, 1927, 1928, 1929 and 1930, Hagen wrote that he had a stated sum, shown later to be the balance due Anderson, which ''is being used and will continue to be used as a trust fund for the benefit of William H. Anderson and/or Zella A. Anderson''. Were the trial court's attention limited to these words, as it faced the task of determining the relation created by the parties, it might well have been required to hold that a technical voluntary trust had been created. However, ''there is no magic in mere words of this character'', as our Supreme Court stated in *Estate of Shaw*, (1926) 198 Cal. 352, 360 [246 Pac. 48], in determining that a trust relation could arise without the use of the words ''trust'' or ''trustee''. So, too, it has been held that the use of the words ''in trust'' does

not necessarily result in the creation of a trust, if the intention appears to be otherwise. (*In re Dever's Will,* (1921) 173 Wis. 208 [180 N. W. 839, 841].)

In opposition to Hagen's use of the words "as a trust fund" which, with the exception of the receipt referred to, all appear in documents written after the ninety-nine thousand dollars had been advanced, we find that on numerous occasions the parties referred to the sums advanced as "loans". In May, 1926, Hagen wrote Anderson a letter, the second paragraph of which began:

"About the personal loan, this came to my mind a good many times but I fully intended to show you my ledgers at home. . . . The money came as follows:" listing the dates and amounts of the several remittances received before the middle of 1924, a total of $99,706.20. To this letter Anderson replied, calling attention to a clerical error in one of the figures (not a remittance), but not questioning that the total was properly referred to as a loan. He did suggest that the earnings over $100,000 should be paid to him, to which Hagen replied that he was willing, adding that this would "make my personal loan even $100,000".

In the transaction which is the basis of the rescission action, Hagen and McKnight each sold to Anderson one-third of their stock, the purchase price in each case being $112,500. By his agreement, Anderson had his stock placed in Hagen's name and paid for it by a reduction of $112,500 in the amount Hagen owed him. This explains the reference in Anderson's letter of November, 1926, to Hagen: "Of course, your direct moral responsibility to me remains the same but your loan is now transferred to stock." Confirming the deal, Hagen wrote in the latter part of 1926: "of the $225,000.00 McKnight gets $112,500.00 and the other $112,500.00 will operate to reduce what I owe you—

"You have in round numbers $150,000.00 coming from me. Less $112,500.00 will leave a balance due you about $37,500.00."

In March, 1927, Hagen wrote: "I owe you . . . a total of $43,667.93." In August, 1929, Anderson stated in a letter after referring to several matters: "That the only interest which I have outside of the above is the personal loan to you." Again in September, 1930, Anderson reminds Hagen: "I have advanced you personally a considerable sum of money."

Even in those statements upon which plaintiff's case depends we find ideas at odds with the theory that Anderson had placed these sums technically in trust with Hagen, indicating that Hagen was employing the words "in trust" in their popular sense. In the first statement of all, the receipt, after reciting that the $20,000 was to be used in a trust fund, Hagen wrote: "In case of death the undersigned authorizes his duly authorized administrator to pay this amount from the funds of his estate," an idea more in harmony with the receipt of a loan than of money in trust. Some of the yearly reports were accompanied by a detailed statement headed, "personal account", concluding with the words: "Total owing Major" (Anderson). In each yearly report were listed the resources of Hagen's estate available to pay Anderson. Among these resources we find life insurance, both personal and that carried by the Weber Company and all of Hagen's stock in Weber Company, much of which had been acquired quite independently of Anderson's aid.

Anderson's testimony on the witness stand supports the trial court's conclusion that the money was loaned. He testified respecting the first sum advanced, that he gave no specific directions concerning it "except it was to be used in his Weber business. I did not go into the details of it". Again he testified: "The money was not given to him in the first place for any particular stated return, but more as an assistance to him in extending his business." The following questions and answers were before the trial judge: "Q. In case these funds were lost, was Mr. Hagen to repay you, or were you to take the loss, or what was the arrangement? A. If he had any way of repaying it, probably it would have been paid, because he practically mortgaged his life insurance policy, or at least assigned it in various agreements. Q. You expected to be reimbursed for this money, regardless of the effect of the investment? A. Absolutely." He further testified that on a later date he had told Hagen that his interests were in the Philippines and he was not interested in joining any company out here; but "that I would be very glad to keep on assisting him in turning over money to him and aiding him in that way".

Probably the most important bit of evidence, because it was an attempt to put in writing the working arrangement between them, we find in a letter written by Hagen to Ander-

son shortly after the receipt of the $20,000, which went into a Clark and Beckett building deal, and not into stock, but before the advance of any further funds. The first three paragraphs of the letter read:

"Dear Major: I wanted to get a letter into your hands covering the manner in which I will take care of the money that you are entrusting to me.

"The money that I need from the first $50,000 which I use in paying off McKnight, I am going to treat as deal #1. I will have definite figures on this before the first of the year. The money that I use in connection with retiring my debt to McKnight will be handled on the following basis:

"The capital that we employ in handling Weber will be treated as the capital stock; this will run approximately $200,000. Net earnings of the Company as shown by our income tax reports, will be the basis of division of earnings between yourself and myself on the money that I employ to pay McKnight. I am going to set up and credit you with the first 6%, I take the second, you take the third, I take the fourth, and so on, and I am going to divide 50–50 with you, which I am sure will be a reasonably good earning on the money employed."

Not only in the letter from which we have just quoted was Anderson informed that "his" money was to be used to pay for stock in Weber Company which Hagen was buying in order to put himself on a par with McKnight, but in the letter of May, 1926, already referred to he pointed out that the $20,000 first forwarded, "is wrapped up in the Clark Building Loan. This leaves $79,706.22 that is wrapped up in common stock in our companies here on the coast". Reference is then made to his (Hagen's) ownership of 1025 shares.

From all the evidence before him, the trial judge was justified in concluding that the portion of the ninety-nine thousand dollars which Anderson had entrusted to Hagen and which Hagen had used to buy stock, was loaned to him for that purpose, among others, and was known to Anderson to have been used for that purpose, and the stock was not acquired by Hagen through a breach of trust. The judgment in the "accounting case" should be affirmed.

*Rescission Case, Civil No. 10690.*

■ Encouraged by Anderson's fatherly advice "that if you do not go forward . . . you must eventually go back-

ward'', Hagen and McKnight acquired a controlling interest in three concerns engaged in the same field as was the Weber Company, in order, as Hagen wrote Anderson, that the ''Weber Company might step in and run the dairy supply and machinery business of the State.'' These three concerns may be identified, for our purposes, as Prising Company, Warr Supply and Cap Company. As a part of their expansion program, that which Hagen had hoped for for some time was accomplished: Anderson took a third interest in their venture, paying McKnight $112,500 cash for the stock acquired from him, giving Hagen credit for an equal sum on his indebtedness, for the stock acquired from him. This transaction, consummated in the fall of 1926, Anderson attempted to rescind in 1933, on the basis of fraud just then discovered.

In his complaint Anderson, suing Hagen alone, alleged that he had been induced to acquire a third of the stock of Weber Company, and of the other three concerns mentioned, by the false representations made by Hagen: (a) That he (Hagen) personally owned 260 shares of the Prising Company, 1025 of the Weber Company, one-half of the stock of Warr Supply and 24 shares of the Cap Company; (b) that Weber Company was worth $500,000, of which $380,687.82 included no intangible value, such as good will; (c) that the value of the entire capital stock of Warr Supply was $37,180.

Declining to draw inferences inconsistent with the trial court's findings, as we are invited to do, but instead, noting that evidence which supports facts and reasonable inferences based thereon which uphold the trial court, we find justification for this summary. While Hagen and McKnight acquired the stock in the three companies in their own names, they did so, as Anderson was told, on behalf of Weber Company, with Weber Company money and credit. The stock was carried in their names rather than that of the Weber Company so that the trade might not know that Weber Company had taken these concerns over. The stock which Anderson acquired was one-sixth of that in Weber Company from Hagen, a like amount from McKnight, by which means he acquired a third of the interest that Weber Company had in Prising Company and the others. It also appears to be the fact that Hagen owned half of the stock of Weber Company at the time of this deal; it was not true, as we noted in the accounting case, that a part of that which stood in his

name was really owned by Anderson because purchased with his money.

In the negotiations which preceded Anderson's decision to take a third interest in the Weber business, figures were furnished him in order that a basis upon which he should pay for his third might be agreed upon. What value should be placed on Weber Company, which was the medium through which profits were expected, was a matter of some uncertainty. McKnight, Hagen told Anderson, thought that $750,000 was a fair figure for the Weber Company, but Hagen thought a lower figure could be agreed upon. The figure $500,000 was finally used, and that this included some $125,000 of "water", Anderson knew. There seems to have been no reliance upon or use made of the net figure alleged in the complaint. The year 1926, when this expansion program was entered upon, cast quite a different hue on probable profits than appeared in the light of the year of 1933; 10 per cent on the set-up, including Weber Company at $500,000, seemed possible, and it was that that decided Anderson.

With respect to the claim that $37,180 was represented as the value of the entire capital stock of the Warr Supply, the evidence justifies the conclusion that that figure was used as the inventory basis of the assets of the company, and if it proved to be incorrect, an adjustment was to be made; it was not represented as the value of the entire capital stock. That, apparently, was $40,000, for only three-fourths of it was being acquired, and that for $30,000. In any event, Anderson was not induced to buy into Weber Company on any representation with respect to Warr Supply; his answers on the witness stand justify the conclusion that he was paying no attention to the part that that company's affairs had in the deal.

Much emphasis is placed by appellant upon the fact that Hagen, Anderson's trusted agent, made a large profit on the sale of his interest. Were this an undisclosed profit the point would have some relevancy, but it was known. Anderson wrote to Hagen in September, 1930: "If I paid $225,000 for the original one-third in O. J. Weber then $112,500 must have gone to you and $112,500 to McKnight. This figure naturally represents a very handsome profit for both of you but that is what it should have been." The inference is well founded that the fact was known to him all along. The argu-

ment that that profit was over $80,459, founded upon Hagen's inclusion of that amount in an income tax statement, is fully answered by the explanation that that amount represented the profit made also by McKnight on the first sale, and the profit he (McKnight) made on the subsequent sale of his remaining stock for $190,000. We need not consider the wisdom of this method of preparing an income tax statement; one of Anderson's counsel stated in the courtroom that it was he who figured it out for Hagen. It is but illustrative of much to be found in the 830 pages of the reporter's transcript and two volumes of letters and accounts: an inference adverse to the court's decision might be drawn, but there is substantial support for the decision, unless we take it upon ourselves to disbelieve witnesses and weigh their testimony.

A further finding supports the trial court's judgment, that is, the finding that it was not true that the plaintiff had offered to restore to Hagen everything of value that plaintiff had received from him on condition that he restore to the plaintiff the purchase price of $112,500. The plaintiff throughout the trial resisted the contention that the sale was a joint sale. We are inclined to the view that plaintiff's position is tenable; he had a right to rescind as to Hagen's sale irrespective of what he did as to McKnight's. If this be so, it follows that to make the rescission effective he must either return that which he received, which no one claims he did, or offer to do so upon Hagen's doing likewise, which the trial court found he did not do. (Sec. 1691, Civ. Code.) What the evidence shows that the plaintiff did do was to offer to return what he had received "provided that, and upon the condition that, you (Hagen and McKnight) restore to the said William H. Anderson the said sum of Four Hundred Fifteen Thousand Dollars ($415,000.00)". His offer to restore was thus expressly conditioned upon the restoration of a sum made up not alone of what Hagen had received in his deal, but, in addition, of what McKnight had received in his two deals. The code does not authorize a rescission on any such condition. The judgment that plaintiff take nothing in his rescission action was warranted.

*The Conversion Action, Civil No. 10669.*

One of the incidents that took place toward the close of the decade of business dealings between Anderson and Hagen was the endorsement and deposit of the stock certificate which

evidenced that Hagen and his wife still had five hundred shares in Weber Company. At Anderson's suggestion or request, the Hagens endorsed their certificate and it was left in the safe box of the Weber Company. Thereafter it was sold, as a pledge, and the $15,000 received credited on the debt due from Hagen. The sale was an unauthorized conversion of their stock, the Hagens claimed, and brought this action in which they recovered judgment against both Anderson and Weber Company in the sum of $100,000.

    The determinative issue at the trial was whether the stock had been pledged, as Anderson testified, or whether it had been endorsed, as Hagen stated, simply to make more expeditious a possible sale of Weber Company. Upon this issue Mrs. Hagen was called as a witness, although she had no part in the transaction with Anderson other than to endorse the certificate at her husband's direction, and over timely and proper objection she was permitted to testify, in response to the question: ''What was told you at the time that it was signed by you? . . . A. My husband handed it to me asked me to sign it and I asked him why he wanted me to, and he said Major wanted us to sign them, and he said that Major was worried about his affairs, and that he has plans in his head that probably that he might plan to sell to Cherry & Burrell and that was all I knew about those plans, and he said that he thought we should cooperate with Major and that we certainly could trust his judgment, and I felt the same way about Major, and I signed it, and was perfectly happy to sign it.''

The question called for and received an answer which, on the matter in dispute, was clearly hearsay, a statement the purport of which was an explanation of the nature and purpose of the deposit of the stock. Because the evidence on this vital point was in direct conflict, the error of admitting this testimony cannot be said to be without prejudice.

The judgments in the accounting and rescission cases, Civil Nos. 10689 and 10690, are affirmed; that in the conversion case, Civil No. 10669, is reversed.

York, Acting P. J., and Doran, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 21, 1937, and an applica-

tion by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 20, 1937.