HIER, Administrator, Respondent, *v.* FARMERS MUTUAL
FIRE INSURANCE CO., Appellant.

(No. 7,642.)

(Submitted April 3, 1937.   Decided May 4, 1937.)

[67 Pac. (2d) 831.]

*Mr. Frank M. Catlin and Mr. Howard M. Lewis,* for Appellant, submitted a brief; *Mr. Lewis* argued the cause orally.

474

476

*Mr. J. E. Rucker* and *Mr. Ernest L. Walton,* for Respondent, submitted a brief.

MR. JUSTICE STEWART delivered the opinion of the court.

This is an appeal from the district court of Roosevelt county. Roman Temmel and his wife, Mary Temmel, were residents and farmers in Roosevelt county. Temmel was an Austrian and spoke the English language indifferently. He was a man of excitable character and eccentric habits, although withal industrious, frugal, and reasonably capable in business affairs. His wife had been previously married and had at least one child by that union.

The Temmels occupied certain lands which were apparently handled as a farm unit. The legal title to part of these lands stood in the name of the husband, and a part thereof stood in the name of the wife. It appears that the wife had furnished certain funds from a private source for the improvement of the land. Most of the work in clearing the land of brush, constructing buildings, and otherwise improving the farm was done by

the husband. He had constructed a very good house, a barn, and several other farm buildings. These buildings, in addition to the house and barn, consisted of two cattle sheds, chicken house, bunk house, ice house, garage, shed, and granary. The latter three were apparently built together. Counting these separately, there were ten buildings. Counting the three as one building, there were eight units. The buildings were upon lands that stood in the name of Mary Temmel.

On April 5, 1930, Roman Temmel applied to the agent of the Farmers Mutual Fire Insurance Company, a local company organized for the insurance of the buildings belonging to the members of the company, for a fire insurance policy on the house and barn. The application was made to one McCracken, agent at Bainville. The usual form of application was filled out by the agent from information furnished by Temmel. The agent did not at the time go to the property and examine it but had knowledge of the buildings and knew what he was insuring. The value placed upon the house was $2,250, and the insurance taken out thereon was $1,600. The value placed on the barn was $1,000, and the insurance taken out thereon was $600. Temmel assumed to give from memory the description of the tract upon which the buildings stood, but the description so given and included in the application, and later in the policy, was not a true description of any of the lands owned by either Roman or Mary Temmel; in fact, the description was not a technical legal description of any land in that region.

The application signed by Temmel contained the following statement: ''I hereby warrant, covenant and agree with said company that the foregoing is a full, just and true exposition of all facts and circumstances, conditions, situation and value of the property to be insured, so far as the same are known to me and material to the risk.''

The buildings were erected very close to the line between the part of the ranch that stood in the name of Roman Temmel and the part that stood in the name of Mary Temmel. Apparently the actual location was not ascertained until after the

fire, when a survey was made which disclosed their actual geographical position. Temmel was apparently under the impression that, while the buildings were close to the line, they were on the part of the ranch that stood in his name.

The policy was issued under date of April 10, 1930, and it remained in effect and premiums were paid thereon until April 8, 1934, when the insured house and barn and all of the other buildings on the place were almost entirely destroyed by fire. Temmel was present at the time of the burning and his wife was apparently there at the time the fires were started, although she left before the buildings were burned up. Neighbors rushed in and observed Temmel upon the premises. All of the buildings were burning at the same time, although they were spaced some distance apart. The first neighbor to arrive at the scene of the fire was one Hook, who proceeded there with two men who were at his home to help him move his belongings from the place he then occupied to the Temmel farm, which was about three-quarters of a mile distant and upon which he had a short-term lease. About 1:30 o'clock in the afternoon Hook observed smoke rising from the Temmel place and he and his men rushed over to see if any of the property could be saved. On the way over they met Mrs. Temmel coming away from the place in an extreme state of excitement. She did not make any coherent explanation but merely said, ''It's all over,'' or something to that effect. They proceeded to the place, but before they could do anything toward saving the property they observed Temmel on a knoll or hill a slight distance from them with a rifle. All of the buildings were burning and conditions were such that they were convinced that they had all been set on fire at about the same time. Fearing that Temmel would shoot them they withdrew and allowed the fire to progress. Later in the day a deputy sheriff and other neighbors proceeded to the place. At that time the buildings had been very largely consumed by fire.

Previous to the fire Temmel had held a sale and sold practically all his belongings, but had retained a truck and some household goods and supplies. The truck loaded with the re-

maining belongings of Temmel was found without the danger zone and intact. Temmel was found in a root house with a shotgun by his side. A wire and string connected the trigger of the gun to his finger. He had apparently shot himself through the lower part of the jaw and head and was dead.

The record shows that the news of the burning and suicide spread rapidly. The agent and officials of the company received knowledge of the fire within a very short time. The company made some investigation as to the matter. Officers thereof visited the scene and apparently ascertained that the buildings did not stand upon the land to which Roman Temmel had legal title but did stand upon lands to which the legal title was in the name of Mary Temmel. An attempt was made to cancel the policy on that account.

In due time an administrator was appointed. Demand was made for payment of the insurance and suit was instituted. The complaint alleged all of the usual and essential facts, including the insurance of the buildings and the complete destruction thereof by fire, and also alleged that a mutual mistake was made as to the description of the lands upon which the buildings stood. The prayer for relief contained demand for reformation of the application which was later made a part of the policy so as to make the same conform to the actual description of the lands. The specific request for reformation was as follows: "That certain words and figures be stricken from the application of the policy and others inserted, and that the answer to the question as to the title to the property be stricken and that there be inserted in lieu thereof the following: 'That the title to the above real estate is in the name of Mary Temmel, but I personally own the dwelling and barn hereby sought to be insured against loss or damage by fire or lightning.' " The money judgment demanded was $2,200, the full amount of the insurance, with interest.

All available defenses were set up in the answer, including the claim that Temmel burned the buildings to obtain the insurance. Likewise the equitable defense that Temmel's estate would be enriched by the collection of the amount of the in-

surance, and that the Insurance Company was entitled to an equitable counterclaim for the amount thereof. The net result of the allegations of the answer was to the effect that the estate take nothing by the suit. A reply was filed admitting the burning but alleging that Temmel was insane at the time thereof. The cause proceeded to trial before a judge from an outside district called in to try the case without a jury.

The court made findings of fact and conclusions of law. The findings of fact were to the effect that Temmel died on April 8, 1934; that Hier was appointed administrator; that the burned buildings stood on land the legal title to which was in Mary Temmel; that Roman Temmel owned the buildings and burned them while insane; and that the contract of insurance should be amended and reformed to conform to the facts as pleaded in the complaint. The decree then followed ordering the reformation and awarding judgment to the estate for the full amount of the insurance. The appeal is from the judgment.

Twenty-nine assignments of error were made, but appellant defined the issues of this appeal in the following language:

"1. Was the policy of insurance invalidated by the mistake in the application therefor?

"2. As the defendant alleged in its answer, and plaintiff scantily, if at all, denied in his reply, and the court determined in its findings, unappealed from, the insured burned the buildings covered by the insurance: Does this prevent plaintiff's recovery?

"3. Is the insanity of the insured a defense to his incendiarism?

"4. Was such insanity of plaintiff's intestate established by the proof? .

" (a) Was the testimony of the attending physician properly admitted, over defendant's objection?"

We have examined the assignments of error and the arguments and authorities in support thereof and in opposition thereto. We are convinced that the four questions tendered

by appellant really contemplate the necessary issues and we shall therefore discuss them in the order tendered.

The matter of the reformation of the contract comes within ██ the decision in the case of *Thielbar Realties, Inc.,* v. *National Union Fire Ins. Co.,* 91 Mont. 525, 9 Pac. (2d) 469. The opinion in that case contains a discussion of the question of mutual mistake in a matter of this kind. It is not necessary to repeat it here. The authorities are collected and cited in the opinion and the reasons for the declaration of law are given. In the absence of any equitable bar, there can be no question that the mutual mistake made by the insured and the agent at the time the application was made and the policy written may be cured and rectified. If the other assignments are resolved in favor of plaintiff, it follows that any such bar would be automatically removed. If Temmel were without legal mental capacity at the time he burned the buildings, assuming that he did burn them, then neither he nor his successors would be barred by the equitable maxim, "He who comes into equity must come with clean hands." This is so because the law, as will be discussed shortly, places no stigma of unclean hands upon either a litigant who is insane, or one who is representing such insane person's interests in such a case as this. The doctrine has no application where the facts do not show a case of unclean hands. (21 C. J., p. 190, sec. 177.) Assuming that the other facts found by the court were sufficiently supported by the testimony, the reformation was appropriately ordered. (See, also, 14 R. C. L., p. 902; note to case of *Traugott Wirsching* v. *Grand Lodge, etc.,* 3 Ann. Cas., p. 444, 67 N. J. Eq. 711, 56 Atl. 713, 63 Atl. 1119.

The next assignment of error involves the right of an insured to collect insurance upon buildings burned by himself. At this point it is important to observe that there is no direct testimony as to the cause of the fires that consumed the buildings. No one testified that Temmel started these fires or that he admitted that he did so. Doubtless his wife, Mary Temmel, knew of these facts, but she did not testify, so that the matter

rests entirely upon circumstantial evidence. The court found that Temmel burned the buildings but that he was insane when he did so. At this point we are interested only in the question of his having done so, without reference to his lack of mental responsibility at the time he did it. The record is voluminous, and while there is no direct testimony to show that he actually burned the buildings, the circumstances all lead to the conclusion and support the finding made by the trial court that he did so. The evidence discloses the fact that Temmel and his wife had domestic difficulty. The wife desired to return to her old home in Minnesota, there to reside with some of her relatives. Temmel had been sick and was highly nervous. Some months before he had appealed to the county commissioners of the county for medical treatment and relief. He was placed under the care of Dr. Cloud, the county physician, for observation and treatment. He was in a hospital at Wolf Point for about two weeks. Some surgical and medical relief was afforded and the doctor made a careful study of the case. He remained under observation and treatment from March 27, 1933, until October 3, 1933.

In various conversations Temmel had manifested obvious mental disturbance. In his endeavor to close his matters up and get out of the country he had held the sale and leased the ranch to his neighbor, Hook. The real property and buildings were all covered by a real estate mortgage for $500 to one Jensen, also a witness. Upon the advice of the deputy sheriff and other friends he had endeavored to obtain a federal farm loan, apparently to take up the mortgage and furnish other necessary funds for use on a contemplated trip south to consult a doctor. The loan matter was slow in coming through. During the time he was waiting for action on his application he discussed the matter with some of his neighbors. He appeared to be laboring under the delusion that the government and Jensen were trying to take his place away from him. He declared that before he would allow this to be done he would ''burn'' and he would ''kill too.'' His actions were so irrational and violent that they impressed some of his neighbors with his mental incom-

petency.  Early in the morning on the day of the fire the witness Hook delivered two letters to him, one of which was the refusal of the Federal Farm Loan Bank to take the loan.  Temmel did not make any threats at that time.  It was later in the day that this witness observed the smoke of the burning buildings and hurried to the scene of the fire.  There was a substantial amount of evidence, all of a circumstantial character, pointing to the fact that Temmel did fire the buildings.  An empty kerosene can was found near the ruins of the cattle shed.  A cap that fit the spout was found near the body of Temmel.  It is not necessary to rehearse all of the testimony.  Dr. Cloud testified that at the time he had Temmel under observation he believed that he was insane.  He testified that he told the county commissioners that at any time the patient grew worse he should be sent to the insane asylum.  We shall later discuss the admissibility of this testimony.

The finding of the court that Temmel burned the buildings was, as we have observed, based entirely upon circumstantial evidence.  This court has often declared: ''The solution of any issue in a civil case may rest entirely upon circumstantial evidence.  *  *  *  All that is required is that the evidence shall produce moral certainty in an unprejudiced mind.  *  *  * In other words, when it furnishes support for the plaintiff's theory of the case, and thus tends to exclude any other theory, it is sufficient to sustain a verdict or decision.'' (*In re Cissel's Estate,* ante, p. 306, and cases therein cited.)  We think it is obvious that the court was not without evidence to support the finding that Temmel burned the buildings.  It is not our function nor our right to read the record to determine whether or not we agree with the conclusion reached by the trial court, if that conclusion is based upon evidence.  (*Anderson* v. *Hagen,* (Cal. App.) 66 Pac. (2d) 168.)  We may, however, say in this connection that a fair reading of the record in this case leads inevitably to but one conclusion, and that is that Temmel burned the buildings.

It must be observed that the policy of insurance does not carry any special provision with respect to lack of re-

sponsibility for buildings burned by the insured. We have, however, a statute on that subject. Section 8141, Revised Codes, provides: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of his agents or others." If, then, Temmel burned his buildings while sane in order to get the insurance, he could not collect therefor, and his estate could not recover.

The next and the main assignment of error involves the question of the insanity of the insured as a defense to the incendiarism. That issue also depends very largely upon circumstantial evidence. Every man is presumed to be sane and responsible for his acts. In this case the court found that Temmel was insane and therefore not responsible. Such being the case, the section of the statute above quoted is not applicable.

The answer to issue 3, last above mentioned, is found in many authorities. In the late work of Sunderlin on Fire Insurance, Chapter 23, p. 4, the rule is thus announced: "Where the insured, at the time of destroying the property is insane, the cases are unanimous in holding the insurer, in the absence of a provision excepting such a case, liable; since the insured is incapable of entertaining a fraudulent intent, or of having a conscious design to destroy the property. (17 L. R. A. (n. s.) 189.)" In another late work, 6 Cyclopedia of Law & Insurance, by Couch, p. 5333, par. 1483, it is said: "So, an insane person can form no wrongful or fraudulent design in destroying his own property, so far as insurers are concerned, and the insurers are liable, although insured himself burns the property when insane, since the burning of property by the insured while insane will not absolve the insurer from liability, in the absence of any provision to that effect in the policy." (See, also, the following cases and authorities: 6 Cooley's Briefs on Insurance, 2d ed., p. 4939; 26 C. J., sec. 443 (a), p. 348; 14 R. C. L., sec. 403, p. 1223; 5 Lawson's Rights, Remedies & Practice, sec. 2090, p. 3559; *Karow* v. *N. Y. Continental Ins. Co.*, 57 Wis. 56, 15 N. W. 27, 32, 46 Am. Rep. 17; *Bindell* v. *Kenton County A. F. Ins. Co.*, 128 Ky. 389, 108 S. W. 325, 129 Am. St. Rep. 303, 17 L. R. A.

(n. s.) 189; *Showalter* v. *Mutual Fire Ins. Co.*, 17 Pa. Co. Ct. R. 558; *D'Autremont* v. *Fire Assn. of Philadelphia*, 65 Hun, 475, 20 N. Y. Supp. 344; *First National Bank, etc.*, v. *Newark Fire Ins. Co.*, 118 Pa. Super. 582, 180 Atl. 163.) A careful study of the authorities on the subject leads us to the conclusion announced by Sunderlin, supra, that the authorities are unanimous on the subject, and that Temmel was insane when he burned the buildings and his estate is not precluded from recovery.

The fourth issue tendered by appellant contemplates the weight of the evidence on the question of sanity. What we have said heretofore must be borne in mind, because this issue also very largely depends upon circumstantial evidence. The subhead considered under this issue involves the right of Dr. Cloud to testify. Respondent claims that the insanity of the insured was established without the testimony of Dr. Cloud. With this contention we are inclined to agree. When it is considered that the whole property was only incumbered by a $500 mortgage, that the value of the insured buildings was $3,250, that the insurance thereon was $2,200, leaving a margin of $1,050 of value not covered by insurance on the house and barn, and that the other buildings were of substantial value, it becomes obvious that even though the insurance had been collected by Temmel during his lifetime if he had lived, he stood to lose, and his estate since that time stands to lose, a very substantial amount by the burning. The question of design to defraud is thereby minimized. It is very evident that the loss to Temmel and his estate was as much as, or more than, the loss sustained by the insurance company.

Again having resort to all of the circumstances, it is plain to an unprejudiced student of the record that Temmel had manifested sufficient signs of mental instability previous to the fire to arouse the suspicions of neighbors and friends. At one time he went to the house of the deputy sheriff at Bainville and explained his troubles to him. They were joined by another friend and the two of them went to the ranch, where they dis-

cussed the family matters and troubles with Temmel and his wife separately and together. These men were convinced that the condition was serious. They were not experts and, of course, their final conclusion was not evidence, but the facts they related, with all of the other facts and circumstances detailed to the court in the course of the trial, formed the basis upon which the court made its final conclusion. It is not necessary to detail all of these facts and circumstances or to discuss the matter of the weight to be given to such testimony. They were before the court for its proper consideration. We find no error in the admission of the testimony given by the lay witnesses.

Dr. Cloud was called as a witness for the administrator and ▮▮ was allowed to detail the facts as to his examinations and treatment of Temmel at times previous to the fire. He was also allowed to state his opinion as to his sanity. Strenuous objection was made to 'the admission of his testimony on the ground of statutory privilege as contained in section 10536, subdivision 4, Revised Codes, which has to do with the disability of a physician or surgeon to testify without the consent of his patient in any civil action as to information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient. In considering this matter we must have in mind the fact that the object of the statute, and of all such statutes, is not to absolutely disqualify a physician from testifying, but to enable a patient to secure medical aid without betrayal of confidence. (28 R. C. L., p. 542.) The same authority states: ''The patient may therefore waive objection and permit the physician to testify. In other words, the privilege is the privilege of the patient and not of the physician; and by the great weight of authority, if the patient assents the court will compel the physician to answer. * * * The physician cannot waive the statutory privilege and testify against the wishes of his patient.'' In this case it must be understood that the statute could only apply on behalf of the patient Temmel. It could not be asserted by the physician, and we fail to see wherein the Insurance Company had any right to

assert the privilege as against the plaintiff in this case. It was never intended that such a claim of privilege could be asserted by an adverse party to defeat the proof of an alleged ailment which was a necessary element to the plaintiff's cause of action.

We may assume all of the other facts of this case without the death of the insured and then assume that the insured lived to recover his sanity and thereafter brought suit upon the insurance policy. Unquestionably, he could have waived the privilege proposition and could have called upon the doctor to testify in the matter. In 5 Jones' Commentaries on Evidence, p. 4194, it is said: "By the weight of authority, however, it is held that since the patient may waive the privilege for the purpose of protecting his right, the same waiver may be made by those who represent him after his death, for the purpose of protecting rights acquired by him."

Appellant complains bitterly that a specific waiver does not appear in the record. We do not believe that there is any substance in this objection. The calling of the witness by the administrator of the estate of deceased certainly amounted to a waiver, especially in view of the fact that the only basis for recovery depended upon the existence of the insanity in regard to which the physician was called to testify. (5 Wigmore on Evidence, sec. 2389, p. 220.)

Finally, appellant contends that since a person of unsound mind is civilly liable in damages for a wrong done by him and such liability survives his death as against his estate, the insured has injured the Insurance Company to the amount of the insurance liability, and that such injury damage is an offset against the company's policy liability. We do not agree with this contention.

It must be remembered that here we are dealing with a contractual obligation between an insurer and an insured, as differentiated from a relationship between an injured party and a tort-feasor. Here the Insurance Company expressly assumed certain risks against fire loss in return for good consideration

paid. By virtue of Chapter 30, Revised Codes (secs. 6185 et seq.), relating to mutual rural fire insurance companies, and particularly section 6191, Id., the company was specifically authorized by statute to provide in its by-laws, if it chose to do so, the "character of property to be insured, and under what restrictions and limitations." Thus it is plainly seen that if this company did not want to assume the risk of fire loss at the hands of a policy holder who, while insane, burned his insured buildings, it should have expressly excepted such risk. (See section 8140, Rev. Codes.) The policy, including the articles of incorporation and by-laws was absolutely silent with respect to such risk. On this point the court in *Karow* v. *N. Y. Continental Insurance Company,* supra, had this to say: "The substance of the decisions seems to be that a fire policy covers all risks of loss or damage by fire, save only such as are excepted by the terms of the policy and such as are caused by the voluntary act, assent, procurement, or design of the assured himself. In this respect the law of fire insurance seems to be in harmony with the law of life insurance."

Section 8141, supra, is of no help to the insurer in the case of insane burning. It absolves the company from liability in case of a wilful burning, but does not exonerate it in the case of an insured's negligence. Here we are dealing with an alleged incendiary who, in legal contemplation, was without will of his own and therefore incapable of doing a wilful or voluntary wrong. The Wisconsin court in the *Karow Case,* supra, stated what we believe to be the correct solution of the problem: "Of course, negligence involves a want of care in one who ought to bestow care. It is an omission of duty. But the law imposes no duty—no obligation of care—upon one who has no control over his mental faculties, and hence no control over his physical action. Being under no obligation of care, and under no restraint of duty, and incapable of exercising either, it would be inapt, if not inaccurate, to say that, by his omission, an insane person was guilty of negligence. Since burning through the negligence of an insured who is sane does not relieve the com-

pany from liability, for a much stronger reason the same act by one who is incapable of care would not. But while the negligent burning by the assured of his own property does not relieve the company from liability, yet the negligent burning of another person's property would subject him to damages on the ground of negligence. So, while the burning of his own property by an assured under no restraint of duty and incapable of care, and without any intent or design, does not relieve the company from liability, yet the same act of burning another's property might subject such person to damages therefor, not on the ground of negligence, as that word is usually understood, but in the language of Chief Justice Gibson, supra [*Beals* v. *See,* 10 Pa. 56, 61], 'on the principle that where a loss must be borne by one of two innocent persons, it should be borne by him who occasioned it.' ''

For the reasons stated, the doctrine of tort liability set-off is not applicable to a case of this kind. To apply such principle would be in effect to modify the terms of the contract. If the Insurance Company did not want to assume the risk of burning by insured while insane, it was its right to include an exception to that effect in its policy. It is neither our duty nor our function to read in such an exception. (Sec. 10519, Rev. Codes; *Sullivan* v. *Metropolitan Life Ins. Co.,* 96 Mont. 254, at page 270, 29 Pac. (2d) 1046; *W. T. Rawleigh Co.* v. *Washburn,* 80 Mont. 308, at page 314, 260 Pac. 1039; *General Fire E. Co.* v. *Northwestern A. S. Co.,* 65 Mont. 371, 386, 211 Pac. 308.)

The judgment is affirmed.

MR. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICES ANDERSON, MORRIS and ANGSTMAN concur.