BROR JOHNSON, Plaintiff and Respondent, v. ST. PATRICK'S HOSPITAL and STEPHEN L. ODGERS, Defendants and Appellants.

No. 11470.
Submitted November 19, 1968. Decided December 20, 1968.
448 P.2d 729.

Garlington, Lohn & Robinson, C. P. Brooke, Sherman v. Lohn, (argued), William Evan Jones, (appeared), Missoula, for defendants and appellants.

Landoe & Gary, Anderson & Brown, H. B. Landoe and Gene I. Brown, (argued) Bozeman, for plaintiff and respondent.

THE HONORABLE VICTOR H. FALL, District Judge, sitting in place of MR. JUSTICE WESLEY CASTLES delivered the Opinion of the Court.

This is an appeal by the defendants from an adverse judgment rendered by the court below. The complaint was based upon a charge of negligence against the defendants and was tried to the court siting without a jury. Essentially the factual situation as presented was as follows:

The plaintiff, Bror Johnson, when doing construction work for the Northern Pacific Railway in 1940 fell some 55 feet from a trestle and sustained, among other injuries, a severe hurt to his right hip. He was treated at the Northern Pacific Hospital in Missoula, Montana and as a part of the over all procedures had what is called a Smith-Peterson nail driven through the head of the femur and into the ball of the hip to stabilize and correct injuries to that area. No question is presented here with regard to the correctness of this type of procedure as such. The record reflects that he was hospitalized from September of 1940 until some time about 1941 and that despite the many serious injuries sustained, in addition to that

to the hip, he seems to have made a quite remarkable recovery. He stated on his direct examination that after he left the hospital "The only thing that was causing me any discomfort at all was my hip, and that was just rather slight actually." Thereafter he worked at several different occupations such as a welder in the shipyards at Portland, for about 18 months, a short time as a fireman for the Northern Pacific Railway and then about the first of March, 1945, he started what appears to have been his longest steady occupation and that was as a city bus driver in Missoula, Montana. He followed this occupation until about March of 1955 and gave as his reason for doing this type of work that his hip "* * * was a, on the painful side so I took a job driving a city bus * * *."

Sometime in the spring of 1955 he consulted with the defendant, Dr. Odgers, regarding the increasing pain to his hip with the end result that the Doctor performed an operation upon the plaintiff at St. Patrick's Hospital, (the other defendant herein) the latter part of March of 1955. The operation, as this Court understands it, amounted to this—the Doctor removed the Smith-Peterson nail referred to above, opened up the front part of the thigh exposing the hip joint, removed the original hip ball as it had deteriorated and installed a prosthesis called a Roger Anderson type of appliance. This is a ball and pin made of stainless steel which is fastened onto the head of the femur and it takes the place of the hip ball that nature had provided. No question whatever is presented as to the correct diagnosis by Dr. Odgers of the propriety of this type of operation as a means toward correcting the difficulty of plaintiff at that time. The operation was completed and the plaintiff left the hospital in April, following. Subsequently Dr. Odgers moved from Missoula to California and Johnson never saw him after he left the hospital.

The operation was not a success. The plaintiff, according to the record, was considerably more disabled after the operation than before. Prior to that time he got around with dif-

ficulty but thereafter his hip was "so terribly painful" and we learn that he got around only with the use of crutches. As might be expected, he consulted with other doctors regarding his continuing problem and went to a Dr. Wallace of Spokane in the spring of 1956, who advised further surgery. This was not done for the reason, as plaintiff stated, he "didn't have any money". Thereafter and in 1959 he and his family moved to Bozeman and in the first part of December of 1962 he there consulted with a Dr. Cole. At that time he had a "severe swelling in my, in my incision on the right side of my leg, a short incision there made by the operation in 1955. It was, oh, like a large boil coming up with no head on it, I would say, very tender". Dr. Cole lanced this and pus drained from it. A few days later he consulted with Dr. Allen Iddels of Bozeman, regarding the constant drainage from his hip, who probed the wound and gave it conservative treatment consisting of medication and packs. The wound continued to drain and the plaintiff's testimony is "there was something plugging the wound there that stopped the drainage, and it started to swell again" whereupon he states that his wife, after sterilizing a pair of tweezers, reached into the wound to unplug it, and did so. Thereafter it plugged up again and upon his third visit to Dr. Iddels in December of 1962, he states that the doctor "opened the wound or drainage hole a little bit more and unplugged it" and that he took from it a piece of gauze about an inch long which he described in some detail. Thereafter the drainage stopped for quite an appreciable period of time but a new and more severe pain appeared in July of 1965 at which time the wound puffed out, reopened and started draining again. Dr. Iddels again used conservative treatment but after a time and in March of 1966, and after further consultation with a Dr. Losee, an orthopedist practicing at Ennis, Montana, another operation was performed by Dr. Losee, assisted by Dr. Iddels with, as far as can be determined from the record, a fairly reasonable degree of success.

It is appropriate at this time to make some comment about the qualification of the several doctors involved in this litigation.

Dr. Stephen L. Odgers, who performed the operation in 1955, completed his undergraduate work at the University of Montana, took a Master of Arts there and then completed medicine at the University of Kansas Medical School. He stated, upon direct examination "* * * orthopedic training qualified me for the Board of the University of Illinois, research, educational hospital in Chicago." From that time on he has been engaged in the general practice of orthopedics and is admitted to practice medicine in Kansas, Montana, California and Mississippi. At the time of the trial he was a member of the Los Angeles County Society of California Medical Association, the American Medical Society, the Western Orthopedic Association, the American Academy of Orthopedics, Society of Orthopedic and Traumatology and a fellow of the American College of Surgeons. At the time of the trial he was living in Claremont, California and apparently moved to that state in 1955.

Dr. Alan Iddels was graduated from Cornell University Medical College in 1948 following which he took a rotating internship for one year at New Britain General Hospital, New Britain, Connecticut; that was followed by a residency in Obstetrics and Gynecology at Bryn Mawr Hospital, Bryn Mawr, Pennsylvania for one year; thereafter he had four years of residency training in general surgery at the Memorial Hospital in Wilmington, Delaware and was certified as a specialist in general surgery by the American Board of Surgery in 1956. At the time of the trial he had been in Bozeman, Montana for a period of 8 years, and had practiced surgery for 13 years. He is not an orthopod.

Dr. Gerald A. Diettert, who testified for the defense was graduated from the medical school at Washington University at St. Louis, in 1954; he interned in residency in medicine,

1954 to 1958; has practiced in Missoula since that time and is certified as a member of the American Board of Internal Medicine.

Dr. Losee who performed the final operation on the plaintiff was not called as a witness. He is referred to and is a well known and highly qualified orthopod, practicing his specialty at Ennis, Montana.

Dr. Eugene J. P. Drouillard was graduated from Wayne State University College of Medicine, Detroit, in 1947; completed a fellowship in radiology and was Chief of Radiology at Fort Sill, Oklahoma Hospital for two years; he is a diplomate of the American Board of Radiology.

No question is, or was, raised by either side at any time as to the qualifications of the several doctors referred to above who testified in this matter as to their ability to qualify so as to give their respective opinions upon medical questions presented.

The principal issue presented in this litigation can quite properly be described as razor sharp. The position of the plaintiff and respondent is that in the course of the operation in 1955, performed by the defendants, a surgical sponge was left in the wound and this was the source of his trouble and the sole cause of it. He supports this by the testimony of Dr. Iddels, who testified that he found a piece of gauze, which appeared to him to be a part of a surgical sponge, in this draining wound in 1963 and, also, by testimony on the part of the plaintiff and his wife that they, from time to time, picked threads which appeared to be cotton threads that seeped from the wound. The position of the defendants is that not only did they not leave a sponge in the wound but that it could not have happened, and supported this position with testimony that they did not use the type of sponge described by Dr. Iddels for the reason that ever since about 1951 a raytex type sponge was invariably used for major operations, and that this type of sponge will show up in an x-ray and

they produced x-rays taken after the operation, and long before any known infection appeared, and no sponge can be discerned therein. The testimony further disclosed, however, that gauze type sponges were still in use for minor operations and a nurse testified that the gauze type sponges and the raytex type sponges were kept in the same store room. Defendants' testimony also was to the effect that there was a sponge count. The hospital chart shows a line drawn through the space where a sponge count is entered, which Dr. Iddels interprets as meaning there was no sponge count. The defendants on the other hand, interpret this to mean that there was a sponge count and that it was correct. Two of the four nurses who assisted in the operation appeared as witnesses and their testimony supported that of the defendant, Dr. Odgers, in that they testified as to the use of raytex type sponges and that there was a sponge count and it was correct.

Nurse Marsh, who testified, was the "circulating" nurse at the operation in St. Patrick's Hospital in 1955. She described in some detail the procedure followed there during operations in general. On cross-examination she stated "I don't recall the case specifically, no."

Nurse Keffler, also a circulating nurse at the operation was asked the following question and gave the answer as set forth:

"Q. With reference to that particular operation, can you describe the hospital procedure at that time with reference to the transportation of sponge packages to the operating room? A. Specifically, no, I cannot on this particular case. However, the general procedure is to count them before they are opened when the cases are in process."

The most that can be said for the testimony of the two nurses is that they testified as to the usual and customary procedures followed by them when assisting with major surgery at St. Patrick's Hospital in about 1955.

No one denies that a serious infection developed in the hip of the plaintiff, Bror Johnson. The defendants say that it

well could be caused by the placing of the Smith-Peterson nail, back in 1940, or that a sponge might have been left in the wound at that time, or that the placing of the Roger Anderson prosthesis in 1956 could well have, after the passage of time, created the infection. In briefs and in oral arguments before this Court no room whatever was left to reconcile the positions of the parties, the plaintiff and respondent charging negligence and the defendants denying the same.

On each side in the court below the respective litigants were represented by eloquent and, what is more important, very able counsel. The case was extremely well prepared and well presented. It was tried before the senior trial judge of Montana, well known for his ability and for his care in the trial of cases. It is a tribute to his ability that the lawyers agreed to try it before him without a jury. Following the trial he made extensive findings of fact and conclusions of law and found in favor of the plaintiff.

■ ■ It is a basic rule of law, so basic that it hardy requires citation of authority, that where a fact issue or issues are presented before either a court sitting alone, or with a jury, and there is substantial evidence to support the findings of the court or the jury verdict, such findings or verdict are conclusive on appeal. It is only when there is an absence of creditable testimony introduced below to support the result that this Court is justified in reversing for failure of proof. Certainly here we have a situation of a direct and irreconcilable conflict on a fact issue supported on each side by substantial conflicting evidence and this Court is of the opinion that the findings of the learned court below should not be disturbed on this appeal.

This matter was discussed at length in the very recent cases of Peery v. Higgins V. C. & W. Const. & Mfg. Co., 152 Mont 140, 447 P.2d 481, 25 St.Rep. 727, (decided November 20, 1968) and in Kincheloe v. Rygg, 152 Mont. 187, 448 P.2d 140, 25 St.Rep. 763, (decided December 3, 1968). These two cases together with

the cases cited therein are ample authority for the above.

In addition to the error assigned as to the evidence and discussed above the appellants strongly urge that reversible error was committed when the court below sustained the objection of the plaintiff to the introduction of any testimony by Dr. William J. McDonald, M.D., who was called as a witness by the defendants. The circumstances surrounding this situation are rather unusual--during the month prior to trial plaintiff's counsel had stipulated with defendants' counsel that Dr. McDonald, an orthopedic surgeon, could examine the plaintiff and testify as to his findings at the time of trial. Immediately, however, upon Dr. McDonald being called plaintiff's counsel invoked the physician patient privilege and objected to any testimony from him on that basis. As explanation plaintiff's counsel stated:

"The Plaintiff did stipulate and agree that Dr. McDonald could examine this witness this month of this year, and it was only yesterday during the time of this trial that we learned or found out that this doctor had treated the Plaintiff in the years 1958 and 1959.

"We believe that there was a doctor-patient relationship that we did not know of at this time, and that, at this time, we are invoking the doctor-patient privilege.

"THE COURT: Is that right, Mr. Johnson? A. Yes, Sir, that is right."

The privilege involved here is personal (Hier v. Farmers Mutual Fire Ins. Co., 104 Mont. 471, 67 P.2d 831, 110 A.L.R. 1051) and the court quite correctly and carefully inquired of plaintiff himself, as reflected above, as to invoking the privilege which the plaintiff did. Thereafter the court made careful inquiry into the question as to whether the relationship of physician and patient actually existed and in the course of the colloquy between the court and the witness, Dr. McDonald, the following transpired:

"THE COURT: * * * was he your personal patient

when he got there? A. (By the Doctor) I would say that he was at that time, Sir."

The foregoing sets forth very clearly that the relationship did exist, that the objection was taken personally by the plaintiff and we find and rule under the circumstances here present that the court's ruling was correct.

Appellants insist that this was a manifest and serious error, particularly because Dr. McDonald was the only orthopod called who was not in some way involved in this action and was called purely to give an expert opinion. A rather extensive offer of proof was made by the defendants which was by the court denied. In argument before this Court the appellants insist that if this testimony had been received and considered the decision, in all probability, would have been the other way. The respondent insists that the testimony, even if received, would have been only cumulative. Whether considered or not this Court is of the opinion that the objection was properly taken and that it was properly sustained. In this connection it is to be noted that the respondent did not claim surprise nor ask for a continuance to the end that they might secure some other orthopod to examine the plaintiff with a view of securing, or attempting at least to secure testimony such as they expected to elicit from Dr. McDonald. Under the circumstances here presented it would appear that the court below very possibly would have granted a continuance and given appellants an opportunity to have completed their case. Their failure to do so, or make any attempt to do so, foreclose them on this position.

The judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES HASWELL, ADAIR and JOHN CONWAY HARRISON, concur.