·JEROME DeFORD, Plaintiff and respondent, *v.* HENRY WANSINK, Defendant and Appellant.

No. 11553.
Submitted March 12, 1969.
Decided March 25, 1969.
452 P.2d 73.

488

Landoe & Gary, Bozeman, H. B. Landoe (argued), Bozeman, for appellant.

Cooke, Moulton, Bellingham. Longo & Mather, Billings, B. E. Longo (argued), Billings, Richard W. Josephson, Big Timber, for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment of the district court of Sweet Grass County, entered upon findings of fact and conclusions of law; the court sitting without a jury.

Plaintiff, Jerome DeFord, was a relatively young man whose life had been as a ranch hand and ranch foreman. He took a five year lease on a ranch at an annual rental of $6,000. He was without funds and applied for an FHA loan of $35,000. His loan was tentatively approved, and provided for various things under a "farm plan" including the purchase of cattle. Plaintiff also owed money at a bank. He was beginning on a "shoestring" financially.

Plaintiff sought out defendant, Henry Wansink, because he had heard that defendant might furnish cattle on a share basis. Defendant was a long-time livestock dealer and had previously entered into 35 such arrangements. After a brief negotiating period, defendant advanced $6,000 to plaintiff to make the lease payment. He was shortly repaid. Also, the parties arrived at

an understanding and went to defendant's lawyer's office where a written contract was entered into.

The contract provided that defendant would furnish 150 head of breedable yearling heifers, together with bulls in sufficent numbers to service the same. Plaintiff would care for them; defendant would pay veterinary bills on the heifers. This was in May, 1964. As compensation plaintiff would receive 100% of the calf crop in 1965, and 65% in 1966 and 1967. Division of the calf crop was to be by weight at weaning time. The cattle were all to be branded with defendant's brand and the contract provided specifically that:

"* * * * after the division of the calf crop each year, [defendant] will deliver unto [plaintiff] a bill of sale for his share * * *, provided that [plaintiff] is at the time not indebted to [defendant] for any expenses or advances made by [defendant] unto [plaintiff]".

Additionally the contract provided:

"* * * that [plaintiff] shall not place upon the ranch premises * * * any cattle other than * * * [defendant's] during the spring, summer and fall * * *, but in the event that the hay crop * * * is sufficient to adequately winter, feed and care for the said cattle and calf crop of [defendant], [plaintiff] shall have the privilege of taking in additional livestock for winter feed * * *".

Defendant delivered 159 heifers over a period of a few days after the middle of May. He also delivered six yearling bulls, four of which he sold on June 25 to plaintiff. Also, in June he delivered two more bulls. It would appear that during the breeding season defendant had four yearling bulls at least, and eight at the most.

Almost immediately after the contract began, side transactions occurred. As a cattle broker, defendant bought for plaintiff, another 100 head of cattle for the ranch. That fall, as winter approached, conversations were had about feed, pasture, hay and supplemental cake. According to plaintiff's ver-

sion, about a pound and one-half per day of cake would be fed; defendant wanted 3 pounds per day fed so defendant would pay the additional. According to defendant's version the cost of supplemental cake was all the burden of plaintiff.

About January 1965 an additional pasture area was leased by defendant. This was known as the "Murphy Lease", for which defendant paid $3,100. The cattle of both plaintiff and defendant grazed it. Again there are two differing versions of the transaction the details of which are not of importance here. There was testimony about a cross-fence with defendant claiming that it was not put in until fall; while plaintiff claimed he put it in as soon as defendant delivered the materials.

Along in the fall of 1965, some 18 months after the written contract was entered into, plaintiff arranged to sell his share, being 100% of the 1965 calf crop. Plaintiff testified as follows:

"A. I called him (defendant) in the morning and told him that I had a buyer and that I would like for him to come over, he would have to sign the bill of sale on his, and I told him what day the calves would go and I told him to bring his books with him so we could get settled up.

"Q. And what did he say to you? A. He told me to go to hell."

The defendant's version was not substantially different except that in his deposition he testified that the reason he refused to give a bill of sale was because plaintiff refused to tell him who he was selling the calves to. However, on trial, defendant gave a new reason, insisting that plaintiff refused to pay money he was indebted for.

At any rate, this ended the contract. Plaintiff could not meet his financial obligations and was advised to return the cattle to defendant which he subsequently did, again with some differences in versions by the parties.

Plaintiff brought this action to recover damages for breach of contract, or in the alternative for quantum meruit. Defendant counterclaimed for damages for breach of contract. The court

entered its finding of fact and conclusions of law and judgment for plaintiff after allowing set-offs, in the amount of $16,199.39.

Plaintiff's complaint basically alleged that defendant breached the contract by refusing to give the bill of sale for the 1965 calf crop. Defendant, by answer and counterclaim, alleged several ''advances'' and expenses were paid by defendant on behalf of plaintiff and that the contract provided these to be repaid before the bills of sale were delivered and that the parties mutually agreed to terminate the contract. Plaintiff alleged extra services, such as caring for dry cows, and certain other monetary damage. Plaintiff then alleged in the alternative on a quantum meruit claim seeking compensation for services rendered.

The district court found that a contract had been entered into, that plaintiff did everything required of him, that defendant withheld the bills if sale without cause, thereby preventing plaintiff from further performance of the contract. The court further found that the value of plaintiff's services was $18,-579.91, allowed set-offs for advances by defendant, and ordered certain items of personal property returned. The counterclaim of defendant for reimbursement of the rental on the ''Murphy Lease'' was dismissed.

On appeal, the defendant urges issues which are somewhat intertwined and we divide for discussion as follows:

(1) Was there sufficient credible evidence to find as the court did:

A. That plaintiff performed and that defendant breached without cause.

B. That the breach made it impossible for plaintiff to continue under the contract.

(2) Was the measure of recovery the reasonable value of services performed by plaintiff and was the evidence of that value proper and sufficient?

(3) Did the court err in dismissing defendant's counterclaim to recover the year's rental of the ''Murphy Lease''.

492

The rule is that where there is substantial evidence to support the findings of the trial court the findings are conclusive on appeal. Johnson v. St. Patrick's Hospital, 152 Mont. 300, 448 P.2d 729, 25 St.Rep. 887, and cases cited therein.

As to subdivision A of question , the evidence is at most conflicting, and the trial court believed the plaintiff. Without going into great detail, suffice it to say that the defendant's version was not even consistent within his own testimony. The evidence was simply that defendant refused to give a bill of sale. Just what his reasons were are questionable. His counsel now argues that the provisions of the contract requiring that plaintiff was not indebted was a condition precedent to the giving of a bill of sale. However, counsel's client, the defendant, simply did not testify that way. It is clear too that defendant well knew of the consequences. He knew plaintiff was operating on a financial "shoestring". He went to plaintiff's financier on the loan, obviously intermeddling in an attempt to force plaintiff to the wall. We find that the evidence is sufficient to support the findings on the breach of the contract by the defendant making it impossible for the plaintiff to perform.

As to question 2—the measure of damages, defendant makes a two-fold argument.

1. There is no substantial evidence to support the finding and conclusion that during the existence of the contract the reasonable value of plaintiff's services was $18,579.91.

2. Having found the contract was terminated by the parties, the court erred in failing to find the reasonable value of plaintiff's services was 100% of the 1965 crop, or $8,958.28.

This latter figure comes from the calves having been sold through the Billings auction and the money being held pending the outcome of this suit.

The defendant concedes that the quantum meruit theory can be applied in this case, but argues that the trial court did not use the proper standard in judging the reasonable value of plaintiff's services. Following this argument on, defendant

argues that one, such as plaintiff, who has not fully performed an express contract cannot have recovery, citing Puetz v. Carlson, 139 Mont. 373, 364 P.2d 742. But, apparently conceding that plaintiff had performed the first year of the contract, defendant would use as a standard of reasonable value the "stipulated compensation" from the express contract. Thus defendant reasons, the first year's calf crop is the "stipulated compensation."

However, we have previously related that the parties almost immediately had "side transactions". They took on the additional "Murphy Lease"; defendant promised to supply additional cattle and failed. Defendant, as the trial court found, breached the written contract and made it impossible for the plaintiff to perform the remainder. Under these conditions, in Puetz v. Carlson, supra, we stated at p. 380 of 139 Mont., at p. 746 of 364 P.2d as follows:

"In McFarland v. Welch, 48 Mont. 196, 136 P. 394, this court held that recovery can be had on an implied contract where full performance of an express contract for work and labor was prevented by the acts of the defendant." See also 5 Corbin on Contracts, §§ 1109, 1112, 1113.

Here the written contract was for three years, the first 18 month period was by the testimony of all witnesses the tough and dangerous one with heifer calves. Plaintiff simply did not get the benefit of the second and third year. Under this situation, the trial court was correct in finding that the reasonable worth and value was to be had without regard to the part of the written contract performed.

The evidence of the reasonable value consisted of uncontroverted testimony regarding pasture, hay, hired hands, and prices received. The details were all summed up in one exhibit, plaintiff's exhibit No. 5, none of it was controverted. We find that there was substantial evidence to support the trial court's findings.

Finally, we consider the issue of the dismissal of the de-

fendant's counterclaim to recover the rental paid on the "Murphy Lease", the trial court found:

"Defendant took out a leasehold on property adjacent to the plaintiff's ranch called the 'Murphy Lease' which lease was taken in the name of the Defendant but for and on behalf of Plaintiff with money advanced by Defendant. The defendant promised Plaintiff he would supply additional cattle to Plaintiff to utilize the additional pasture provided by the 'Murphy Lease' and to pay the lease rentals thereon and Plaintiff in reliance on the repeated promises of Defendant to furnish said cattle turned down offers from other ranchers for cattle to place upon said lands until it was too late to acquire any and although repeated demands were made by Plaintiff and repeated promises of delivery were made by Defendant, the Defendant failed and refused to deliver the cattle to Plaintiff and also refused to transfer title to the lease to damage of Plaintiff in excess of the rentals advanced by Defendant and accordingly Defendant's second counterclaim should be dismissed."

Without reciting the details of the testimony, suffice it to say that there was substantial, credible testimony to the effect of the finding just quoted.

Having examined all of the issues presented and finding them without warrant, the judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES JOHN C. HARRISON, BONNER and HASWELL concur.