ANTHONY RUVOLO, A MENTAL INCOMPETENT, WHO SUES
BY ROSE RUVOLO, HIS GUARDIAN, PLAINTIFF-RESPONDENT, v. AMERICAN CASUALTY COMPANY, A
CORPORATION OF THE STATE OF PENNSYLVANIA,
DEFENDANT-APPELLANT.

Argued February 4, 1963—Decided March 18, 1963.

*Mr. John F. Ryan* argued the cause for defendant-appellant (*Mr. Bernard L. Davis,* on the brief; *Messrs. Ryan, Saros, Davis & Stone,* attorneys).

*Mr. Melvin J. Koestler* argued the cause for plaintiff-respondent (*Messrs. Koestler & Koestler,* attorneys).

The opinion of the court was delivered by

FRANCIS, J.   In this action plaintiff, guardian of the insured, sought a declaration with respect to the coverage extended by a policy of liability insurance issued by defendant American Casualty Company.   The trial court entered summary judgment for plaintiff requiring defendant to undertake the defense of a certain damage suit then pending against the insured, and declaring that the policy provided coverage for the liability on which that suit was based.   The defendant appealed to the Appellate Division and we certified the matter before argument there.

Dr. Anthony Ruvolo purchased an insurance policy from defendant under which the company agreed to pay all sums which he "shall become legally obligated to pay as damages" because of the death of any person resulting from [his] "activities."   The contract also obligated the insurer to defend any damage suit brought against Ruvolo alleging such a death "even if such suit is groundless, false or fraudulent."   The coverage extended was limited as follows:

"* * * This policy does not apply:

*    *    *    *    *    *    *    *

(c) to * * * death * * * caused intentionally by or at the direction of the insured."

On June 6, 1960 Dr. Anthony Ruvolo shot and killed Dr. Annunziato La Face with whom he was associated in the practice of medicine.   Ruvolo was arrested immediately and at the instance of the Prosecutor, was examined by two psychiatrists.   Upon their certification that he was insane, he was committed on June 10, 1960 to the New Jersey State Hospital at Trenton.   He is still confined there.

In July 1960 Evelyn La Face, as Administratrix *ad Prosequendum* and as general Administratrix of the estate of her husband, brought suit for damages against Ruvolo alleging that he "wrongfully shot and killed" La Face. The insurer refused to defend the action asserting that the claim was excluded from policy coverage because the death had been caused by the insured's intentional act. We were advised at the oral argument that after this appeal had been taken, the damage suit was settled between the parties, and that it was done pursuant to an agreement with the insurer that the adjustment would be without prejudice to a judicial determination of the question of policy coverage.

When the declaratory judgment proceeding was instituted, defendant filed an answer alleging that Ruvolo's homicidal act was intentional and therefore was not within the protection afforded by the insurance. Plaintiff moved for summary judgment, supporting the application by affidavits of the two psychiatrists on whose certification Ruvolo had been committed, and by affidavits of two other psychiatrists who have examined and cared for him since his admission to the State Hospital.

The first two physicians, who examined Ruvolo on June 6 and 7, 1960, declared him to be "insane," suffering from "Dementia Praecox (Schizophrenia), paranoid type," and that the condition was gradual in onset, ("his paranoid ideas [had been] very strong for several months past"). The affidavits of the two attending physicians were made after 19 months of examination, observation and treatment. They agree that upon admission to the hospital on June 10, 1960, Ruvolo was suffering from paranoid delusions; also, that at and prior to June 10 and continuously thereafter, he was afflicted with a mental disorder classified as "paranoid state." More particularly, one of them deposed that at the time of the killing on June 6, 1960, Ruvolo

"was suffering from a mental disorder which rendered him incapable of distinguishing right from wrong, that his insight and judgment were defective, that he was possessed with delusions of persecution, and

that he did not at that time know the nature or quality of his acts and lacked the mental capacity to control his conduct."

The second one said:

"In my opinion, based upon my early examination [day of admission] of Anthony Ruvolo and confirmed by my frequent contact with and knowledge of the case during the past year and a half, Anthony Ruvolo was psychotic at the time of the alleged homicide on June 6, 1960 and was at that time suffering from a mental disorder which rendered him incapable of distinguishing right from wrong, and that he did not at that time know the nature or quality of his acts and he lacked the mental capacity to control his conduct."

Defendant submitted no answering affidavits or other proof in opposition to that presented by plaintiff. Counsel pointed out, however, that none of the psychiatrists had examined or treated Ruvolo or had actual knowledge of his mental state before the shooting; further that their statements as to his insanity on the day of the homicide were opinions based on subsequent examinations and treatment. And he argued that the motion for summary judgment should have been made on depositions of the doctors, which would have provided him with an opportunity for cross-examination as to the nature and extent of the insanity and whether it was such as deprived Ruvolo of sufficient rational reasoning capacity to conceive and intentionally execute a purpose to shoot Dr. La Face. It is also fairly inferable from the argument that he felt entitled under the circumstances of the case to employ cross-examination to probe into the credibility of the affiants, the basis for their opinion, as well as its medical soundness and legal effect with relation to the exclusionary clause of the insurance contract. Defendant urged that plenary trial was warranted because depositions had not been taken (although it is not suggested that such course is imperative on a motion for summary judgment), and because the subjects sought to be explored were not covered in the affidavits to the point where it could be said that "palpably" there was no genuine factual issue (R. R. 4:58–3). The trial court granted summary judgment for plaintiff holding that the affidavits demon-

strated beyond factual conflict that Dr. Ruvolo was insane at the time of the shooting and lacked the capacity to form a rational intent to kill. A killing in such circumstances, he declared, could not be considered an intentional act and therefore was within the protection extended by defendant's policy.

Clauses excluding coverage for losses caused by intentional wrongful acts are common in various types of insurance contracts and are accepted as valid limitations. In fact, it has been held to be contrary to public policy for an insurer to agree to indemnify an insured against the civil consequences of his own willful criminal act. *Malanga v. Manufacturers Cas. Ins. Co.,* 28 *N. J.* 220, 225 (1958) ; *Morgan v. Greater New York Taxpayers Mut. Ins. Assn.,* 305 *N. Y.* 243, 112 *N. E. 2d* 273, 275 (*Ct. App.* 1953) ; 10 *Couch, Insurance* (*2d ed.* 1962), §§ 41.663–665; 1 *Appleman, Insurance Law and Practice* (1941), § 481; 29A *Am. Jur., Insurance,* § 1194. In applying the exclusory provision, however, whether in a life, accident, liability or fire policy, it has come to be commonly accepted that where the death or loss involved, be it of the insured or caused by the insured, is the product of an insane act, recovery is not barred. See, *e. g., Hier v. Farmers Mut. Fire Ins. Co.,* 104 *Mont.* 471, 67 *P. 2d* 831, 110 *A. L. R.* 1051 (*Sup. Ct.* 1937) ; *Provident Life & Accident Ins. Co. v. McWilliams,* 146 *Miss.* 298, 112 *So.* 483 (*Sup. Ct.* 1927) ; *Markland v. Clover Leaf Casualty Co.,* 209 *S. W.* 602 (*Mo. Ct. App.* 1919) ; *Corley v. Travelers' Protective Assn.,* 105 *F.* 854 (6 *Cir.* 1900) ; *Berger v. Pacific Mut. Life Ins. Co.,* 88 *F.* 241 (*C. C. Mo.* 1898) ; *Van Zandt v. Mutual Benefit Life Insurance Co.,* 55 *N. Y.* 169; 14 *Am. Rep.* 215 (*Ct. App.* 1873) ; Annotation, 110 *A. L. R.* 1060 (1937) ; 1 *Appleman, supra, p.* 590, *n.* 7; *Couch, supra,* § 41.667; 29A *Am. Jur., supra,* §§ 1199, 1304.

In this context, however, the critical, or more precise, problem is the nature or extent of the mental incapacity necessary to transmute the character of the act involved from intentional to insane. Broadly stated, if the actor does not have the mental capacity to do the act intentionally, the policy

coverage remains operative. The test has been expressed in this wise: If the deceased was killed by one incapable of distinguishing between right and wrong, or of forming a rational intent to do the act, the death would not be intentional, *Corley v. Travelers' Protective Ass'n, supra,* (105 *F.,* at *p.* 862); if the death was caused by the voluntary act of the insured, when his reasoning faculties were so far impaired that he was not able to understand the moral character, or the general nature, consequences and effect of the act he was about to commit, the killing was not "intentional," *Berger v. Pacific Mut. Life Ins. Co., supra;* or, if the person was suffering from such an impairment of the mind as to render him incapable of acting rationally, his homicidal act cannot be considered intentional, *Provident Life & Accident Ins. Co. v. McWilliams, supra.* The rule has been put in the terms applied in determining guilt or innocence in the criminal law, *i. e.,* whether at the time the life was taken the killer was so unbalanced as not to be able to distinguish between right and wrong in reference to the act. *Markland v. Clover Leaf Casualty Co., supra;* 1 *Appleman, supra,* §§ 482, 483.

Ninety years ago, the United States Supreme Court, after reviewing a number of authorities which stated the test in various ways, adopted this principle in a life insurance case which excluded coverage if the insured "shall die by his own hand":

"If the death is caused by the voluntary act of the assured, he knowing and intending that his death shall be the result of his act, but when his reasoning faculties are so far impaired that he is not able to understand the moral character, the general nature, consequences and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse, which he has not the power to resist, such death is not within the contemplation of the parties to the contract, and the insurer is liable." *Mutual Life Ins. Co. v. Terry,* 15 *Wall.* 580, 21 *L. Ed.* 236, 242 (1873).

And, see *Connecticut Mutual Life Ins. Co. v. Akens,* 150 *U. S.* 468, 37 *L. Ed.* 1148 (1893); *Charter Oak Life Ins. Co. v. Rodel,* 95 *U. S.* 232, 24 *L. Ed.* 433 (1877).

Although somewhat more restricted judicial utterances are to be found, e. g., *Van Zandt v. Mutual Benefit Life Insurance Co.*, *supra*, the cases referred to above generally reflect what in our judgment should be the criteria for determining the applicability of the exclusionary clause in question. And although a liability policy of the type involved in this action was not the subject of the litigation in the cases cited, we conceive no sound basis for differentiation with respect to the test to be employed in deciding the issue of coverage.

We have no doubt that if a homicidal act of an insured is of such character as to excuse him from criminal responsibility because of insanity, *i. e.*, because at the time of its commission he did not have the mental capacity to understand the nature and quality of his act, or to be able to distinguish between right and wrong with respect to it, the killing should not be considered "intentional" within the meaning of the defendant's policy.

It has been said many times that exclusionary clauses, drawn for the company by men learned in the law of insurance are to be strictly construed against the insurer; that the insured is entitled to protection to the full extent that any reasonable interpretation of them will permit. *Mazzilli v. Accident & Casualty Insurance Company of Winterthur*, 35 *N. J.* 1, 7 (1961). And justice demands that particular emphasis be laid on that doctrine where the conduct insured against involves possible injury or damage to members of the public. For that reason, while such mental incapacity as would excuse an act from criminal responsibility would preserve the insured's protection under this policy, in our opinion coverage should not be limited to cases which satisfy that definition. We hold that if the insured was suffering from a derangement of his intellect which deprived him of the capacity to govern his conduct in accordance with reason, and while in that condition acting on an irrational impulse he shot and killed Dr. La Face, his act cannot be treated as "intentional" within the connotation of defendant's insurance contract.

■ These observations bring us back to the problem of the propriety of the summary judgment against defendant. It is a matter of common knowledge that such judgments are to be granted with extreme caution. The moving papers and the pleadings are to be considered most favorably to the party opposing the motion. All doubts are to be resolved against the movant. It has been said on the federal scene (after whose rule our own is patterned) that a litigant has the right to trial where there is the slightest doubt as to the facts. *Peckham v. Ronrico Corp.*, 171 *F. 2d* 653, 657 (1 *Cir.* 1948); *Doehler Metal Furniture Co. v. United States*, 149 *F. 2d* 130, 135 (2 *Cir.* 1945). If there is such a doubt it cannot be said the movant's case is unequivocally established or that palpably there is no genuine issue as to any material fact challenged. *R. R.* 4:58–3.

■ When this declaratory judgment action was instituted, defendant filed an answer asserting that the insured's shooting of Dr. La Face was an intentional act and therefore not covered under the insurance policy. The issue thus raised had in its support a presumption of Dr. Ruvolo's sanity at the time of the killing; and the undisputed facts that he obtained a shotgun and fired it at his associate on their face lend some additional probative force to the presumption. The affidavits produced in support of the motion provided only opinion evidence in support of the claim of insanity. The affiants never examined Ruvolo before the shooting and knew nothing about his condition or symptoms, if any, prior thereto. No affidavits from his wife or friends or professional associates at the hospital where he practiced were presented to show any abnormal behavior or symptoms, or medical treatment before the unfortunate incident. The history as to his previous condition appearing in the affidavits of the psychiatrists was obtained from Ruvolo himself after the event. In view of the homicide charge and the civil liability, no one could have a stronger motive for self-serving statements. And their very lucidity as noted in one of the certificates of insanity cannot escape attention on such a motion. The fol-

lowing appears in the certificate of Dr. Robie whose first examination was about seven hours after the event:

"He states that persons he worked with at the hospital had remarked that he appeared mentally depressed and in need of treatment on several occasions during recent months * * *."

Despite the obvious availability of proof of Ruvolo's condition prior to June 6, 1960, none was offered. Plaintiff was content to rest on self-serving history and the post-event opinions of medical witnesses based thereon. Credibility of the history as well as of the doctors who predicated their opinions on it, was obviously at issue. We were told on oral argument that the insurer had procured no medical examinations of Ruvolo. While this failure leaves the defense in a more vulnerable position than it might have occupied if such examinations had been obtained, the right to trial is not lost unless the record is not open to any reasonable factual doubt as to the legal sufficiency of plaintiff's case. We agree with the Federal District Court of Delaware that where a case may rest upon opinion or expert testimony, a court should be particularly slow in granting summary judgment. *Anthony P. Miller, Inc. v. Wilmington Housing Authority,* 179 *F. Supp.* 199, 205 (*D. Del.* 1959); see, *Mayflower Industries v. Thor Corp.,* 15 *N. J. Super.* 139, 156 (*Ch. Div.* 1951), affirmed 9 *N. J.* 605 (1952). The same hesitancy should exist where the court is necessarily required to resolve questions of intent and mental capacity. Ordinarily in such situations justice is best served by plenary trial on the merits. And the need for caution is especially urgent where a party must rely for his case largely on what he can draw out of his adversary's witnesses. *Bozant v. Bank of New York,* 156 *F. 2d* 787 (2 *Cir.* 1946); *Arnstein v. Porter,* 154 *F. 2d* 464 (2 *Cir.* 1946). Of course, defendant could have asked for leave to take the depositions of plaintiff's medical witnesses prior to argument of the motion, but such course in a case like this is not a compulsory substitute for the examination of those witnesses at trial in open court. *Arnstein v. Porter, supra, p.* 470, *fn.* 11.

We do not suggest that this type of litigation is immune from summary judgment. But the right to such disposition ought to appear so clearly as to leave no room for controversy. The fact that one may surmise reasonably that defendant is unlikely to prevail on a trial is not a sufficient basis to deny the company its day in court, when, as here, plaintiff's right to succeed depends on issues of credibility and the probative value of opinions of expert witnesses as well as the reliability of the underlying facts upon which the opinions are based. Ordinarily in such a factual framework it is undesirable to withdraw the witnesses from cross-examination.

On the record before us we sense some lack of the details necessary for a confident application of the controlling legal principles enumerated above as the criteria for determining the issue of policy coverage. Accordingly, we consider it the part of good judicial administration to withhold decision on the ultimate question in the case until by means of examination and cross-examination of witnesses, a trial record shall present a more solid basis for findings as to Dr. Ruvolo's mental capacity. *Cf. R. R.* 4:58-7.

Reversed and remanded for trial. No costs.

*For reversal and remandment*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.