PEOPLE EXPRESS AIRLINES, INC., PLAINTIFF-APPELLANT, v.
CONSOLIDATED RAIL CORPORATION, BASF WYANDOTTE
COMPANY AND UNION TANK CAR COMPANY, DEFEND-
ANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued May 15, 1984—Decided June 12, 1984.

350

Before Judges ANTELL, JOELSON and McELROY.

*Raymond P. D'Uva* argued the cause for plaintiff-appellant (*Rodino, Forman & D'Uva,* attorneys; *Raymond P. D'Uva* of counsel and on the brief and *Mary Ann Dubiel* on the brief).

*Louis Ruprecht* argued the cause for defendant-respondent Consolidated Rail Corporation (*McDermott, McGee & Ruprecht,* attorneys; *Louis Ruprecht* on the brief).

*John C. Heavey* argued the cause for defendant-respondent Union Tank Car Company (*Carpenter, Bennett & Morrissey,* attorneys; *John C. Heavey* of counsel and *Thomas M. Moore,* on the brief).

*Lorraine M. Armenti* argued the cause for defendant-respondent BASF Wyandotte Company (*Tompkins, McGuire &*

·*Wachenfeld,* attorneys; *Dennis M. Cavanaugh* of counsel and *Lorraine M. Armenti* on the brief).

The Opinion of the Court was Delivered by,

ANTELL, P.J.A.D.

Plaintiff takes this interlocutory appeal, by leave granted February 22, 1984, from an order for summary judgment in favor of defendants. The factual context is drawn from the allegations of the complaint and pre-trial order which we consider most favorably to the plaintiff. *Ruvolo v. American Cas. Co.,* 39 *N.J.* 490, 499 (1963). No affidavits, certifications or any other form of testimonial evidence are before us.

On July 27, 1981 fire broke out in a railroad tank car at the freight yard of defendant Consolidated Rail Corporation ("Conrail") in Port Newark, New Jersey. According to the complaint, a tank car manufactured and owned by defendant Union Tank Car Company and leased to defendant BASF Wyandotte Company was punctured during a negligently performed coupling operation, causing its contents, ethylene oxide manufactured by BASF, to escape and ignite. An order was then issued to evacuate the surrounding area, which included plaintiff's principal business operation in the North Terminal building at Newark Airport.

Plaintiff, an airline transportation company, does not contend that it suffered any property damage as a result of the incident, but seeks recovery of losses caused by the interruption of its business. It claims that most of its flights were cancelled and that it could not receive telephone calls, its major source of passenger reservations, during the 12 hours the evacuation order was in effect.

On January 18, 1984 the Law Division granted defendants' motion for summary judgment on the ground that, absent property damage, economic loss was not recoverable, relying for legal authority on *Restatement, Torts* 2d, § 766C (1979). That provision states:

One is not liable to another for pecuniary harm not deriving from physical harm to the other, if that harm results from the actor's negligently

(a) causing a third person not to perform a contract with the other, or

(b) interfering with the other's performance of his contract or making the performance more expensive or burdensome, or

(c) interfering with the other's acquiring a contractual relation with a third person.

The comment pertinent to the foregoing section reads as follows:

> b. *Physical harm to the other.* The rule stated in this Section applies when the plaintiff suffers only pecuniary loss, such as the loss of the financial benefits of a contract or of prospective trade or financial loss through being put to additional expense. If there is physical harm to the person or land or chattels of the plaintiff, the rule stated in this Section does not apply and there may be recovery for negligence that results in physical harm because of the nonperformance of a contract with the plaintiff. (Cf. §§ 435B, 499). This recovery is of course subject to the usual rules governing liability for negligence. When recovery is allowed, the loss of expected profits or other pecuniary loss may, in an appropriate case, be recovered as "parasitic" compensatory damages.

Although it has never been held applicable by any published opinion in New Jersey, the *Restatement* rule is consistent with results elsewhere reached. *Union Oil Company v. Oppen,* 501 *F.2d* 558 (9th Cir.1974); *Petition of Kinsman Transit Company,* 388 *F.2d* 821 (2d Cir.1968); *General Foods Corp. v. United States,* 448 *F.Supp.* 111 (D.Md.1978); *Stevenson v. East Ohio Gas Co.,* 73 *N.E.2d* 200 (Ohio Ct.App.1940); *Just's, Inc. v. Arrington Const. Co.,* 99 *Idaho* 462, 583 *P.2d* 997 (Idaho 1978). See also *James,* "Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal," 25 *Vanderbilt L.Rev.* 43 (1972).

The reasoning applied in the foregoing cases varies, and the issue has been analyzed in terms of duty, proximate cause, foreseeability and remoteness of risk. But the restrictive results reached "do not derive from the theory or the logic of tort law," *James, supra,* 25 *Vanderbilt L.Rev.* at 44. Rather, they appear to rest upon a limiting principle formulated in each case to guard against a "mass of litigation," *Stevenson v. East Ohio Gas Co., supra,* 73 *N.E.2d* at 203, and liability "grossly dispro-

portionate to [defendant's] fault," *Just's, Inc. v. Arrington Const. Co., supra,* 583 *P.2d* at 1005, flowing from "remote and speculative injuries which [defendant] could not foresee in any practical sense of the term," *Union Oil Co. v. Oppen, supra,* 501 *F.2d* at 563. Responding to this approach, concern has been expressed that out of preoccupation with protecting a negligent defendant from disproportionate consequences results may come about at least equally "out of proportion to the plaintiff's entire innocence." *Prosser, The Law of Torts* § 50, p. 296 (3rd Ed.1964); *Petition of Kinsman Transit Company, supra,* 388 *F.2d* at 823.

The closest New Jersey decision is *Rickards v. Sun Oil Co.,* 23 *N.J.Misc.* 89 (Sup.Ct.1945). There, suit for lost profits was brought against a defendant whose barge, by crashing into a drawbridge, destroyed the only road connection between the mainland and an island where plaintiff's business was located. The court concluded that "the alleged wrong was not the natural and proximate result of defendant's negligence, and the defendant is not liable" on the finding that harm to plaintiff was not reasonably foreseeable. *Id.* at 95. Logically, perhaps, that finding was not entirely accurate. "Foreseeability," however, "is not solely a mere matter of logic, since anything is foreseeable, but frequently involves questions of policy as well." *Caputzal v. The Lindsay Co.,* 48 *N.J.* 69, 75 (1966). Citing *Powers v. Standard Oil Co.,* 98 *N.J.L.* 730, 734 (Sup.Ct. 1923), aff'd o.b. 98 *N.J.L.* 893 (E. & A.1923), the *Caputzal* Court added that the determination of proximate cause by a court is to be based " 'upon mixed considerations of logic, common sense, justice, policy and precedent.' " 48 *N.J.* at 77–78. As Chief Justice Weintraub put it in *Goldberg v. Housing Auth. of Newark,* 38 *N.J.* 578, 583 (1962), the question is

whether a *duty* exist to take measures to guard against it. Whether a *duty* exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution. [Emphasis in original].

On this principle the Court in *Caputzal, supra,* characterized the *Rickards* determination as one in which the court denied liability for remote consequences, "implicitly on policy grounds but expressed in the conventional terminology of nonforeseeability and of the results not being the natural and probable consequence of the negligent act...." 48 *N.J.* at 79.

From what has been said it can be seen that the judicial function herein is to strike a fair balance between the risk of damages grossly disproportionate to defendant's negligence and a rule of non-liability equally inapposite to plaintiff's complete freedom from fault. "Each case stands upon its own factual situation." *Rickards, supra,* 23 *N.J.Misc.* at 93. Indeed, as the court in *Rickards* forebodingly noted at the outset of its opinion, there was nothing in the record before it to show defendant's foreknowledge that the bridge constituted the only vehicular access to the island. The suggestion is discernible therein that proof of such knowledge, with its implications to the foreseeability of harm, might have dictated a different result of policy.

In our view the necessary sorting out of facts pertinent to liability in this case cannot be undertaken on a motion for summary judgment. "The legal issues which the parties seek to present carry important implications and they should not be determined in a vacuum or in academic fashion; the preferable procedure is to permit the matter to be tried and determined in regular course." *Beadling v. Sirotta,* 39 *N.J.* 34, 35 (1962). The ruling reaches "far beyond the particular case" and a "[m]aximum of caution is necessary." *Jackson v. Muhlenberg Hospital,* 53 *N.J.* 138, 142 (1969), quoting from *Public Service Commission of Utah v. Wycoff Co.,* 344 *U.S.* 237, 243, 73 S.Ct. 236, 240, 97 L.Ed. 291 (1952). Disposition of the case by application to the pleadings of the *Restatement*'s hard and fast rule barring recovery of negligently caused economic losses in the absence of property damage was clearly not required by relevant principles of tort law in this state. See also *Com. of*

*Pa. v. General Public Utilities Corp.*, 710 *F.2d* 117 (3rd Cir.1983).

■ On the remand which we find to be necessary the trial judge will determine under the authorities discussed whether the evidence can support the finding of a foreseeable risk of harm to plaintiff in the coupling operation such as to result in the imposition of a duty of care. Basically, the analysis should weigh the likelihood, either known to defendants or of which they should have known, that their conduct would ignite a fire with a potential for so great an explosion as reasonably to require prolonged evacuation of plaintiff's building. But also to be considered is whether plaintiff's loss was a direct or remote consequence of defendants' conduct. In this evaluation the lack of any actual property damage may be a significant factor, but not, as we now hold, one which is controlling either upon the question of remoteness or upon the ultimate issue of liability.

■ A clear finding that the loss was distinctly either a direct or indirect result may not be possible. Yet, the extent to which it is found to partake more of one than the other will play a part in defining defendants' duty of care and reasonably limiting their exposure to claims of liability. In this connection it will be useful to study the distinctions drawn by tribunals elsewhere. For example, in *Weller & Co. v. Foot and Mouth Disease Research Institute*, [1966], 1 Q.B. 569, the court found a duty of care to cattle owners against the risk of allowing the spread of hoof and mouth disease, but not to cattle auctioneers whose businesses were also adversely affected. The need to draw subtle lines against possible liability was reflected in the following observation:

[I]n an agricultural community the escape of foot and mouth disease virus is a tragedy which can foreseeably affect almost all businesses in that area. The affected beasts must be slaughtered, as must others to whom the disease may conceivably have spread. Other farmers are prohibited from moving their cattle and may be unable to bring them to market at the most profitable time; transport contractors who make their living by the transport of animals are out

of work; dairymen may go short of milk, and sellers of cattle feed suffer loss of business. The magnitude of these consequences must not be allowed to deprive the plaintiffs of their rights, but it emphasises the importance of this case. *Id.* at 577.

In *Union Oil Company v. Oppen, supra,* recovery was held allowable to commercial fisherman for business losses resulting from injury to aquatic life by an oil spill. However, it was emphasized that not "every decline in the general commercial activity of every business in the [affected] area would be similarly cognizable." 501 *F.2d* at 570. And in *Stevenson v. East Ohio Gas Co., supra,* where it was charged that defendant's negligence caused a fire which resulted in a shut-down of plaintiff's place of employment, it was held that there could be no recovery for resulting lost wages. The frequently cited reasoning of the court was expressed in the following language at 73 *N.E.2d* at 204:

If one who by his negligence is legally responsible for an explosion or a conflagration should be required to respond in damages not only to those who have sustained personal injuries or physical property damage but also to every one who has suffered an economic loss, by reason of the explosion or conflagration, we might well be appalled by the results that would follow. In the instant case the door would be opened to claims for damages based on delay by all those who may have had contracts with The Bishop & Babcock Company either to deliver materials to the company or to receive from the company the products manufactured by it. Cases might well occur where a manufacturer would be obliged to close down his factory because of the inability of his supplier due to a fire loss to make prompt deliveries; the power company with a contract to supply a factory with electricity would be deprived of the profit which it would have made if the operation of the factory had not been interrupted by reason of fire damage; a man who had a contract to paint a building may not be able to proceed with his work; a salesman who would have sold the products of the factory may be deprived of his commissions; the neighborhood restaurant which relies on the trade of the factory employees may suffer a substantial loss. The claims of workmen for loss of wages who were employed in such a factory and cannot continue to work there because of a fire, represent only a small fraction of the claims which would arise if recovery is allowed in this class of cases.

Summarizing the prevailing view, it appears that the duty of care turns on whether

"... the offending conduct foreseeably involved unreasonably great risk of harm to the interests of someone other than the actor. * * * [T]he obligation to refrain from that particular conduct is owed only to those who are foresee-

ably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous. Duty, in other words, is measured by the scope of the risk which negligent conduct foreseeably entails. [2 Harper & James, The Law of Torts § 18.2, at p. 1018 (1956), cited in *Union Oil Co. v. Oppen, supra*, 501 *F.2d* at 568].

See also *Local Joint Exec. Bd. of Las Vegas v. Stern*, 651 *P.2d* 637 (Nevada 1982); James, "Limitations on Liability For Economic Loss Caused by Negligence: A Pragmatic Appraisal," *supra*.

By treating as we have certain factors which we deem appropriate for consideration we have not intended to exclude others which may occur to the trial court upon a complete record. These are, of course, to be included in its deliberations, bearing in mind that the ultimate determination must address the question of whether the threat of an immediate explosion followed by an evacuation order and consequent shut-down of business sufficiently invaded plaintiff's interests as to allow recovery of damages without exposing defendant to so broad a liability as to be incompatible with reason and sound public policy. Thus, in ascertaining the scope of defendants' duty of care the trial court must investigate the possibility of allowing recovery of foreseeable economic loss without setting loose the "spectre of unlimited liability." See *Schiffahrt v. Chelsea Maritime*, (1982) 1 Q.B. 481, 486, commenting on *Weller & Co. v. Foot and Mouth Disease Research Institute, supra*. As we have suggested, the answer must encompass the mechanics of proximate cause, foreseeability of harm, the directness or indirectness of the injury and the nature of the interests involved. Underlying the trial court's study of these issues, it is added, should be a careful concern with implications to the judicial management of what Justice Cardozo (then Judge of the New York Court of Appeals) described as claims "in an indeterminate amount for an indeterminate time to an indeterminate class." *Ultramares Corp. v. Touche*, 255 *N.Y.* 170, 179, 174 *N.E.* 441, 444 (1931). Clearly relevant, in our view, to any inquiry on these considerations is the claimed uniqueness of

plaintiff's status as an occupier of lands adjoining defendant Conrail's freight yard which was the site of the fire.

■ Our reversal of the judgment entered below does not imply that a plenary trial must necessarily result in a jury question or a material issue of fact. As we wrote in *McGowan v. Borough of Eatontown*, 151 *N.J.Super.* 440, 446 (App.Div. 1977),

> We only indicate the necessity in this case of a judge making a legal determination on which the parties' rights hinge on a full and complete record. If, on a plenary hearing, the judge finds no factual issue present or finds a moving party is entitled to a judgment as a matter of law, then judgment should be entered accordingly.

Reversed and remanded for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.