827 A.2d 293

CUMBERLAND MUTUAL FIRE INSURANCE COMPANY, PLAINTIFF–APPELLANT, v. DEBRA LYNN DAHL, AS ADMINISTRATRIX AD PROSEQUENDUM FOR THE HEIRS AT LAW OF GARY EDWARD DAHL, DECEASED; AND AS ADMINISTRATRIX OF THE ESTATE OF GARY EDWARD DAHL; AND DEBRA LYNN DAHL, JAYSON DAHL AND KRISTIN DAHL, INDIVIDUALLY, DEFENDANT–RESPONDENTS, AND MICHAEL MYERS AND STACY M. MYERS AS ADMINISTRATRIX AD LITEM OF THE ESTATE OF MICHAEL MYERS, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued April 9, 2003—Decided July 3, 2003.

Before Judges KING, WECKER and LISA.

*Alfred J. Quasti, Jr.*, argued the cause for appellant.

*James M. McGovern, Jr.*, argued the cause for respondents (*Lomurro, Davison, Eastman & Munoz*, attorneys; *Mr. McGovern*, on the brief).

The opinion of the court was delivered by

LISA, J.A.D.

Plaintiff in this declaratory judgment action, Cumberland Mutual Insurance Company (Cumberland), issued a homeowners' policy to Michael Myers (Myers) and Stacy Myers, his wife. The policy was in effect on November 22, 1998 when Myers shot and killed Gary Dahl (Dahl) and then killed himself. Dahl's heirs and estate instituted a wrongful death and survival action against Myers. Cumberland then brought this action seeking a declaration that it was not obligated to defend or indemnify for Myers' conduct. The

trial judge granted summary judgment in favor of Dahl, determining that Cumberland's policy provides insurance coverage for Myers' killing of Dahl. The judge then denied Cumberland's reconsideration motion and awarded counsel fees to Dahl.

By leave granted, Cumberland appeals from those orders. Cumberland's central argument is that the evidential materials establish that Myers' shooting of Dahl was an intentional criminal act with the specific intent to kill and is therefore excluded from coverage under the policy provisions and applicable decisional law. We agree and reverse the orders under review.

The facts of the shooting and the events leading up to it are not in dispute. These facts have been established through reports of law enforcement agencies and documents obtained by those agencies, including diary entries by Myers, records of two counseling sessions attended by Myers on August 25, 1998 and September 1, 1998, and a psychiatric evaluation of Myers while he was incarcerated on October 30, 1998. The parties cross-moved for summary judgment, agreeing the coverage issue was ripe for summary disposition.

The parties dispute Myers' mental state at the time of the shooting on November 22, 1998. Dahl produced an expert report by Philip H. Witt, Ph.D., a clinical and forensic psychologist. Witt never interviewed Myers. He formed his opinion based on a review of the materials described in the preceding paragraph. The motion judge conducted a limited evidentiary hearing, with the approval of both counsel, at which Witt's live testimony was taken.

We first describe what happened. Myers and his wife married in 1994. They had one child, born in 1994. Myers had a history of mentally and physically abusing his wife throughout the marriage. They separated on August 5, 1998, at which time Stacy Myers obtained a domestic violence restraining order against Myers. The police confiscated Myers' weapons, two shotguns and a bow, as part of that proceeding. Stacy Myers and the child

continued to live in the marital home in Clayton. Myers moved to an apartment in the neighboring town of Glassboro.

After the separation, Stacy Myers began a dating relationship with Dahl, who lived in her neighborhood and had recently separated from his wife. Between August and November 1998, Myers violated the restraining order at least nine times. On November 13, he asked his landlord if he knew where he could get a gun, which he said he needed for protection from Stacy's new boyfriend, who he said had a gun and was threatening him. On November 18, Myers called his wife, asking whose car was in her driveway and stating "over his dead body will she love someone else." On November 20, he called and told her to "tell Gary to kiss his kids goodbye." On the day of the shooting, he called Stacy seventeen times. In one conversation he told her, "You dig your own grave . . ., Til death do us part . . ., I guess one of us will have to die." Stacy called the police. Myers called and the officer took the phone. Believing it was Dahl, Myers said, "F[——] You, Gary." When he was convinced it was actually a police officer he was talking to, he said he did not want to hurt his wife, but "it was Gary he wanted."

On the afternoon of the shooting, Myers borrowed a gun from a friend, telling him it was for hunting and no other purpose. That night, Stacy went out with friends. Her car was at the house, which normally meant she was home. Dahl was in the house, babysitting the child. At about 10 p.m., Myers came to the house, parked his car about a block away, and broke in the back door, dressed in camouflage and armed with a shotgun. He planned to kill Stacy and Dahl, and then himself. He shot Dahl at close range in the head and then shot himself.

Taped to Myers' hand was a suicide note:

To whom it may concern,

This had to be done. They were throwing it in my face. Gary was living in my house. I built that small empire for her. I will not sit back and watch this. God sentenced me to a life of hell all my life. Why can't I get one break in life. I now f[——]ed up so bad that I can't change it. If I don't kill her, Gary and myself, something went wrong. Upon my death, call my sister . . . Mom . . . Aunt . . .

Cousin ... and if you could get a hold of my dad. My sister might know his beeper number. Tell them I want to be buried next to Stacy and in my fireman's uniform. They are my only w[ ]ishes.

According to Witt's testimony, Myers entertained thoughts of killing Stacy and Dahl as early as October 24, 1998. Entries in Myers' diary expressed his dismay over losing Stacy and his jealousy of Dahl. The recovered diary entries were from August 5 to November 1, 1998. Examples of some undated entries are: "Gary is always at house. Stacy spent the night in Englishtown w/ Gary 10-3-98." "Out w/ Gary Rainbow Bar Wednesday 9-16-98." "Out w/ Gary, Nick, James, and Martin Prospectors 9-11-98." "Out w/ Gary & his kids. Chuckie Cheesie's 9-18-98."

Myers was seen by a psychologist, Keith McDermitt, for marriage counseling on two occasions. The first session, on August 25, 1998, was attended by Myers and Stacy. On the second occasion, September 1, 1998, Stacy did not show up, and Myers participated alone. McDermitt noted symptoms of difficulties sleeping and concentrating, restlessness and not controlling his worry well. He found a "partner relational problem," and his diagnosis was generalized anxiety disorder.

While incarcerated in the Gloucester County Jail for violation of the restraining order, defendant was evaluated on October 30, 1998 by a psychiatrist, Prabaker Patel, M.D. Patel's report states, "At the time of this evaluation, patient within a reasonable degree of medical certainty, does not appear to be an immediate danger to self or others." He concluded Myers was "dysphoric",[1] but neither hallucinating nor paranoid. His diagnosis was adjustment disorder.

Cumberland's policy obligates it to pay, within its coverage limits, "those sums which insureds become legally obligated to pay as damages because of bodily injury ... which occurs during the

---

[1] "Dysphoria" means "[e]xaggerated feeling of depression and unrest without apparent cause; a mood of general dissatisfaction, unpleasantness, restlessness, anxiety, discomfort, unhappiness." *Taber's Cyclopedic Medical Dictionary* 593 (17th ed.1993).

policy term and is caused by an occurrence covered here." "Occurrence" means an "accident" resulting in bodily injury. The policy contains exclusions for (1) "bodily injury ..., whether or not expected or intended by the insured, which is a consequence of an insured's wilful harm or knowing endangerment," and (2) damages resulting from "knowing violation of penal law ... committed by ... an insured." Cumberland contends that these provisions preclude coverage for Myers' killing of Dahl.

 "Policy provisions that exclude coverage for liability resulting from intentional wrongful acts are 'common,' are 'accepted as valid limitations,' and are consistent with public policy." *Allstate Ins. Co. v. Malec,* 104 *N.J.* 1, 6, 514 *A.*2d 832 (1986). Indeed, providing insurance coverage for intentional wrongs would encourage such conduct, without regard for pecuniary consequences, and is against public policy. *Ambassador Ins. Co. v. Montes,* 76 *N.J.* 477, 482–83, 388 *A.*2d 603 (1978). Thus, "an insurer may not contract to indemnify an insured against the civil consequences of his own willful criminal act." *Id.* at 483, 388 *A.*2d 603.

 Exclusionary provisions are strictly construed against the insurer, so as to provide the insured with protection to the full extent that any reasonable interpretation will permit. *Mazzilli v. Accident & Cas. Ins. Co. of Winterthur,* 35 *N.J.* 1, 7, 170 *A.*2d 800 (1961). The burden of proof is on the insurer to bring the case within the exclusionary provision. *Burd v. Sussex Mut. Ins. Co.,* 56 *N.J.* 383, 399, 267 *A.*2d 7 (1970).

Dahl relies on the principles announced in *Ruvolo v. American Cas. Co.,* 39 *N.J.* 490, 189 *A.*2d 204 (1963). In that case, Dr. Ruvolo shot and killed his associate in practice, Dr. La Face. *Id.* at 493, 189 *A.*2d 204. He was immediately arrested and examined by two psychiatrists. *Ibid.* They certified that Dr. Ruvolo was legally insane, suffering from schizophrenia, paranoid type. *Id.* at 494, 189 *A.*2d 204. Dr. Ruvolo was immediately committed to a State psychiatric hospital. The criminal charges were apparently not pursued. Dr. La Face's widow brought a wrongful death action. *Ibid.* A declaratory judgment action regarding Dr. Ruvolo's policy

ensued, and two treating psychiatrists opined that on the date of the killing Dr. Ruvolo suffered from a mental disorder that prevented him from distinguishing between right and wrong, he was delusional and psychotic, he did not know the nature and quality of his acts, and he lacked the mental capacity to control his conduct. *Id.* at 494–95, 189 *A.*2d 204.

The Court canvassed authorities supporting the proposition that although willful criminal acts may not be insured against, a death that is the product of an insane act is not barred by an intentional act exclusion. *Id.* at 496, 189 *A.*2d 204. "In this context, however, the critical, or more precise, problem is the nature or extent of the mental incapacity necessary to transmute the character of the act involved from intentional to insane. Broadly stated, if the actor does not have the mental capacity to do the act intentionally, the policy coverage remains operative." *Id.* at 496–97, 189 *A.*2d 204.

After summarizing tests of "insanity" in this context applied in various jurisdictions, the Court announced the test to be applied in deciding the coverage issue:

> We have no doubt that if a homicidal act of an insured is of such character as to excuse him from criminal responsibility because of insanity, *i.e.,* because at the time of its commission he did not have the mental capacity to understand the nature and quality of his act, or to be able to distinguish between right and wrong with respect to it, the killing should not be considered "intentional" within the meaning of the defendant's policy.
>
> . . . .
>
> [W]hile such mental incapacity as would excuse an act from criminal responsibility would preserve the insured's protection under this policy, in our opinion coverage should not be limited to cases which satisfy that definition. *We hold that if the insured was suffering from a derangement of his intellect which deprived him of the capacity to govern his conduct in accordance with reason, and while in that condition acting on an irrational impulse he shot and killed Dr. La Face, his act cannot be treated as "intentional" within the connotation of defendant's insurance contract.*
>
> [*Id.* at 498, 189 *A.*2d 204 (emphasis added).]

 In his report and testimony, Witt opined that Myers' condition and conduct satisfied the *Ruvolo* standard set forth in the emphasized portion of the passage above. Witt discredited the diagnoses rendered by McDermitt, who personally evaluated

Myers three months before the shooting, and Patel, who personally evaluated Myers three weeks before the shooting. He contends they did not have the benefit of Myers' diary entries and suicide note and Myers' condition deteriorated during the time between their evaluations and his death. In Witt's opinion, at the time of the shooting, Myers suffered from a major depressive episode, which "clouded his judgment" and which caused him to act irrationally in killing Dahl and himself. "[Myers] believed, erroneously as a result of his severe depression, that there was no further hope in life for himself, and therefore the only way to end his intractable pain was to kill the sources of his pain—his wife or Mr. Dahl—and then himself."

In his testimony, Witt explained that Myers' multiple violations of the temporary restraining order between August and November were indications of "irrational behavior, lack of control." He noted that, based on several diary entries in October, an impression emerges that Myers was despondent, depressed, having crying spells, not sleeping and obsessed with his wife's relationship with Dahl. The suicide note indicated the severity of Myers' depression, despondency and complete irrationality at that time. Witt concluded that Myers "was not thinking in a way that most of us would consider rational; and that, therefore, he was not able to control his behavior in a way that—that, again, most of us would consider rational and reasonable." Myers' solution, killing Dahl and Stacy, had she been home, and then himself, was not a "rational solution to the problem." Thus, according to Witt, Myers acted under an irrational impulse when he killed Dahl.

Witt acknowledged that Myers possessed the mental capacity to develop and carry out a plan. But it was a "crazy plan." Indeed, the planning process progressed over a number of weeks and included obtaining a gun. Witt conceded that Myers was not legally insane nor did he suffer from diminished capacity. He was able to distinguish between right and wrong. He had the specific intent to kill Dahl. He "committed the crime of homicide." He "knew he was committing a crime at that time." He knew "that

what he was doing was wrong." He knew that "if you shoot someone with a shotgun, you would do serious bodily harm or cause death."

Witt was asked, "But this clouding of Mr. Myers' judgment, if I'm correct, did not completely deprive him of his ability to act in accordance with reason; is that correct?" He responded, "No, it didn't. I mean, he obviously formed a plan that he carried out." Witt's ultimate conclusion was that Myers "carried out an intentional act," but in doing so "he had no control over what he was doing, he was not rational because he did something that was not rational." He acknowledged that people often do things that are "irrational in small ways," but what Myers did was "so substantially irrational to indicate that he had no control over the actions even though he intended the actions and intended the result."

Under Witt's analysis, had Myers lived he would have been convicted of homicide, presumably murder, *N.J.S.A.* 2C:11–3a, or, at the very least, passion/provocation manslaughter, *N.J.S.A.* 2C:11–4b(2). (We hypothesize this offense for purposes of our analysis, although we doubt that the record would support any finding of reasonable provocation.) Perhaps any mental condition from which Myers was suffering, whether generalized anxiety disorder, adjustment disorder, or major depressive episode, would have been considered a mitigating factor for sentencing as "substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense." *N.J.S.A.* 2C:44–1b(4).

The *Ruvolo* standard, however, goes beyond legal insanity. In *Ruvolo*, the Court analyzed the standard by which to determine whether the tortfeasor's *act* is "intentional" or "insane." *Id.* at 496, 189 *A.2d* 204. If the tortfeasor lacks the mental capacity to *act* intentionally, insurance coverage remains effective despite the intentional acts exclusion. *Id.* at 496–97, 189 *A.2d* 204. In *Figueroa v. Hartford Ins. Co.*, 241 *N.J.Super.* 578, 575 *A.2d* 888 (App.Div.1990), we held that the conduct of a tortfeasor convicted of passion/provocation manslaughter could not fit within the scope

of unintentional acts under the *Ruvolo* standard. *Id.* at 588, 575 *A*.2d 888. "[I]t is only when the person is insane or so deranged that he or she could not act rationally that his or her conduct is unintentional." *Ibid.*

■ Here, Myers' act of shooting and killing Dahl was concededly intentional. There is no suggestion that Myers was psychotic or delusional, despite his suicide. This was a premeditated, carefully planned murder. The record does not support the conclusion that Myers' concededly intentional act constituted an "irrational *impulse*." The *Ruvolo* standard is not satisfied by crafting an unreasonable or irrational solution to a solvable problem, even if the actor's judgment is substantially clouded by some mental condition. Indeed, much criminal conduct, intentionally committed, fits this mold. There must be a substantial mental derangement that deprives the tortfeasor of the ability to act intentionally. The standard is not met here.

The orders under review are reversed. We remand with directions to enter summary judgment in favor of Cumberland, declaring that it is not obligated to defend or indemnify.

*Reversed and remanded.*